Conchita WASHINGTON; Sunday Torres; Gloria Batton Robinson; Antoinette M. Frink; Nita Young; Patricia M. Darks; Norma Fay Cook; Angela Sanchez–Martinez; Martha Marie Preston; Titilola I. Odusanya; Alberta Anderson; Loven L. Lewis; Lori Saunders; and Reshawn Richardson, Plaintiffs–Appellees,

v.

Janet RENO, in her capacity as Attorney General of the United States; Margaret Hambrick, in her capacity as Warden of the Federal Medical Center, Lexington, Kentucky; Kathleen Hawk, in her capacity as Director of the Bureau of Prisons; David Woody, in his capacity as Chief Trust Officer of the Bureau of Prisons; the Bureau of Prisons; and United States of America, Defendants–Appellants.

No. 93–6414.

United States Court of Appeals, Sixth Circuit.

Argued May 12, 1994.

Decided Sept. 26, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 3, 1994.

Douglas L. McSwain (argued and briefed), Gene L. Humphreys, Sturgill, Turner & Truitt, Lexington, KY, for plaintiffs-appellees.

Jeffrey Clair, Dept. of Justice, Appellate Staff, Civ. Div. (briefed), John F. Daly, U.S. Dept. of Justice (argued and briefed), Raphael O. Gomez, U.S. Dept. of Justice, Civ. Div., Barbara L. Herwig, U.S. Dept. of Justice Appellate Staff, Civ. Div., Washington, DC, David Bunning, Asst. U.S. Atty., Office

of U.S. Atty., Covington, KY, for defendants-appellants.

Before: SUHRHEINRICH, BATCHELDER, and DAUGHTREY, Circuit Judges.

DAUGHTREY, Circuit Judge.

The defendants, Janet Reno[1], Margaret Hambrick[2], Kathleen Hawk[3], David Woody[4], the federal Bureau of Prisons, and the United States of America, appeal the issuance of a preliminary injunction by the district court. Pursuant to that injunction, the defendants are forbidden from proceeding as envisioned with plans to replace the collect-call telephone system available to federal prison inmates with a direct-dial system monitored by correctional facility employees.

Before this court, the defendants challenge both the propriety and the breadth of the injunction. Because many of the alleged justifications for issuance of the injunction are no longer relevant in this case, we conclude that the injunction should be modified in part and dissolved in part.

## I.

### A.

From the late 1970's until 1990, inmates in all federal correctional institutions wishing to make telephone calls to individuals outside the prison were required to make such calls on a collect-call basis. In fact, regulations governing inmate telephone usage specifically recognized that "[i]nmate calls shall ordinarily be made collect." 28 CFR § 540.104 (1992). Beginning in 1990, however, without promulgation of new regulations on the subject, the Bureau of Prisons began converting the collect-call telephone systems in the federal prisons to a direct-dial inmate telephone service, referred to throughout the proceedings below as "ITS." By the time of the relevant proceedings in this litigation, the ITS system had been installed in 41 of the 72 federal prisons and medical facilities.

The previous collect-call system used in the prisons allowed inmates to make unlimited calls within the disciplinary restrictions of the penal institution. By contrast, the new ITS system in effect at the time of the district court proceedings afforded the inmates the opportunity to purchase direct-dial phone credits at the prison commissary only once a week and limited calls to conversations with individuals named on a list of people approved by correction officials. Each inmate could list no more than 20 numbers on that prisoner's call list. Through ITS, calls by a particular inmate to any telephone number other than those numbers contained on the inmate's call list were automatically blocked by the operators of the system. The call list could be amended by the inmate only quarterly to allow for non-emergency calls to other individuals. While the families and approved visitors of the inmates were routinely accepted for inclusion on the telephone lists, until as recently as March 1994, many prisons around the country followed written policies that automatically rejected as potential direct-dial recipients any court or any elected official. One federal penal institution also maintained a written policy automatically blocking any inmate calls to members of the news media.

Furthermore, under ITS procedures, a potential recipient of an inmate call, other than a family member or prison visitor, was required, prior to being placed on the inmate's approved call list, to complete a form listing information regarding the person's relationship with the inmate, whether the potential call recipient had ever been convicted of a crime, and whether the recipient received calls or written correspondence from any other inmates. If the potential recipient

---

1. Defendant Reno is sued only in her official capacity as Attorney General of the United States.

2. Defendant Hambrick is sued only in her official capacity as warden of the Federal Medical Center in Lexington, Kentucky.

3. Defendant Hawk is sued only in her official capacity as Director of the Bureau of Prisons.

4. Defendant Woody is sued only in his official capacity as Chief Trust Officer of the Bureau of Prisons.

failed to complete and return the form, or if the recipient indicated a desire not to receive calls from a particular prisoner, calls from the inmate to that individual were automatically blocked and the potential recipient received no further consideration for placement on the call list.

The new ITS system was also inextricably linked with prisoner participation in the Inmate Financial Responsibility Program. This program was developed to provide a plan to allow inmates to meet the financial burdens resulting from the imposition of court-ordered fines and restitution, as well as other government obligations. Under the program, a designated amount of money is withdrawn periodically from the inmates' personal accounts to meet the financial responsibilities of the prisoners. As more money flows into an inmate's account, additional withdrawals for the program are made. Moreover, at the hearings on the requests for injunctive relief, evidence was adduced to establish that prison employees were informed that their employment evaluations and determinations regarding salary increases would be based in part on the level of participation in the inmate financial responsibility program in that particular correctional facility. As a further incentive for inmate participation in the program, the rules initially proposed by the Bureau of Prisons to govern the implementation and operation of the ITS system provided that "a new paragraph (d)(10) of [28 CFR] § 545.11 would specify that refusal by an inmate to participate in the financial responsibility program or to comply with the provisions of the financial plan ordinarily shall result in the inmate's being limited to placing no more than one telephone call every three months."

Even under the ITS restrictions originally proposed by the Bureau, however, an inmate would still be allowed to make collect calls to an attorney to discuss legal matters. Although such collect legal calls are generally unlimited, the provisions of former 28 CFR § 540.102 (1993) provided that a warden may, nevertheless, limit such communication if the inmate has an adequate alternative method of contacting counsel.

Money for at least a portion of the installation and operation of the ITS system is obtained from the Prison Commissary Fund. That Fund, a separate account in the United States Treasury, is comprised of money spent by inmates nationwide in the commissaries of federal correctional institutions. Pursuant to the provisions of a Department of Justice circular governing the control of prisoner funds at federal correctional institutions, however, any profits realized from the sale of commissary items are to be placed in a special "welfare fund" and are to be held in trust for disbursement with the approval of the Director of the Bureau of Prisons "for any purpose accruing to the benefit of the inmate body, as a whole, such as amusements, education, library, or general welfare work."

## B.

In June and July 1993, subsequently consolidated lawsuits objecting to the installation of the ITS were filed by various inmates at the Federal Medical Center in Lexington, Kentucky, against the United States, the Bureau of Prisons, officials of the United States government, and officials of the federal prison system. On July 21, 1993, after the filing of the suits, the Bureau then published a proposed rule in the Federal Register seeking to "amend its rule on Telephone Regulations in order to provide for the operation of a debit billing system for inmates" and also seeking to amend the existing rule regarding the inmate financial responsibility program to provide "that an inmate who refuses participation in the inmate financial responsibility program is limited to one telephone call every three months, the minimum provided in existing § 540.100." 58 Fed.Reg. 39096 (July 21, 1993).

On September 14, 1993, the district court granted the plaintiffs' request for a temporary restraining order in order to maintain the status quo in the operation of the telephone systems in federal correctional facilities pending a hearing on the claims raised in the complaints. On September 22, 1993, the plaintiffs filed a motion to certify a nationwide plaintiff class of federal correctional facility inmates, and that same day, friends

and relatives of the named plaintiffs filed a motion to intervene as plaintiffs in the case in order to assert claims that *their* statutory and constitutional rights to privacy were infringed by the ITS requirements that certain recipients of inmate calls provide information to prison authorities regarding communications with other individuals. In light of the defendants' contention that they did not have sufficient time to respond to the plaintiffs' motions for certification of a nationwide class, the district judge withheld a ruling on the class certification motions at that time.

After an evidentiary hearing on the plaintiffs' motion for a preliminary injunction, the district court ruled that the plaintiffs had demonstrated both a substantial likelihood of success on the merits of their claims and the probability of irreparable harm if an injunction were not issued. Specifically, the district judge noted that the listing of only family and visiting friends on an inmate's call list without prior approval of the Bureau of Prisons "raises serious prior restraint concerns." The court also recognized the "complete dereliction" on the part of the Bureau in failing to comply with Administrative Procedures Act requirements for amending the existing rule governing regulation of phone use by federal inmates and noted that the existing phone use regulations "probably create a 'liberty' interest in inmates." Finally, the court concluded that the ITS system, as implemented by the Bureau, "probably violates the appropriations law pertaining to the proper expenditure of trust funds" and "plainly discriminates against indigent inmates as well as non-IFRP participants."

After further concluding that neither the defendants nor the public interest would suffer similar irreparable harm from issuance of a preliminary injunction, the district judge issued an order that enjoined further implementation of the ITS system at federal prisons unless collect-call systems were also made available to the inmates. He also required the Bureau of Prisons to make a collect-call system available within 60 days in each federal correctional institution that had already installed ITS. Furthermore, the district judge enjoined prison officials from linking telephone availability with participation in the inmate financial responsibility program, from restricting the number of collect-call recipients per inmate, and from using any proceeds from the Commissary Fund to pay for implementation of the ITS system at any federal penal institution.

The defendants filed a timely notice of appeal to this court and a motion for stay pending appeal with the district court. The district court denied the motion for a stay, but granted the pending motion of the proposed intervening plaintiffs to join in the lawsuit and the motion to certify a nationwide class of federal inmates as plaintiffs in this matter.[5]

On December 8, 1993, this court granted a partial stay of the injunction pending appeal. Pursuant to that partial stay, the district court's injunction was left in effect for all federal correctional institutions that had not yet installed ITS. The injunction was stayed, however, in those institutions in which the direct-dial calling system was already fully operational.

### C.

On April 4, 1994, the Bureau of Prisons promulgated a final rule concerning telephone usage by inmates in federal correctional institutions. 59 Fed.Reg. 15812–25 (Apr. 4, 1994). That final rule addresses the concerns noted by the plaintiffs in this case and alters the previously existing ITS procedures and requirements in response to many of those concerns. Specifically, the final rule amends the phone-list requirement that accompanied the advent of the ITS system. Under the final rule, an inmate may ordinarily place up to *30* numbers on the call list—a 50 percent increase from the former total of 20 numbers. Moreover, "[t]he Associate Warden may authorize the placement of ad-

---

**5.** The class certification order noted the filing of two similar actions in federal district courts in Georgia and in Kansas. The district court ordered that notice of the Kentucky proceedings be sent to those other plaintiffs and further exempt-

ed the Georgia and Kansas prisoners from the certified nationwide class of plaintiffs unless and until those other litigants notified all relevant courts of their desire to join the certified class.

ditional numbers on an inmate's telephone list based on the inmate's individual situation, e.g., size of family." 59 Fed.Reg. 15824 (Apr. 4, 1994); 28 CFR § 540.101(a).

The new rule also abandons the controversial Request for Telephone Privilege Form that required private information from potential call recipients outside the prison system. In place of the form, the new rule provides that the inmate must acknowledge "to the best of the inmate's knowledge, the person or persons on the list are agreeable to receiving the inmate's telephone call and that the proposed calls are to be made for a purpose allowable under Bureau policy or institution guidelines." 59 Fed.Reg. 15824 (Apr. 4, 1994); 28 CFR § 540.101(a)(1). Ordinarily, all such numbers listed by the inmate will then be placed on the call list. When numbers of individuals other than the inmate's immediate family and prison visitors are listed, however, the Bureau of Prisons will send a notice to those additional individuals informing them that they have been designated as telephone call recipients of the inmate. If the recipients desire to be deleted from the call list, a simple written request to the Bureau will accomplish that result.

In response to concerns raised regarding potential discrimination against indigent inmates in the operation of the direct-dial system, the Bureau's new rule also provides that a minimum of one collect call per month (exclusive of legal calls to an attorney) may be made by inmates without funds.[6] 59 Fed. Reg. 15824 (Apr. 4, 1994); 28 CFR § 540.-105(b). Additionally, the wardens of the federal institutions are authorized by the new rule to increase the number of collect calls available to such indigent inmates "based upon local institution conditions (e.g., institution population, staff resources, and usage demand)." 59 Fed.Reg. 15824 (Apr. 4, 1994); 28 CFR § 540.105(b).

Finally, in response to concerns that the ITS tie-in with the inmate financial responsibility program would place an undue hardship on inmates and their families because additional funds sent to the inmates for phone calls would be tapped for increased program payments, the new rule creates a limited exemption for such outside funds. Pursuant to 28 CFR § 545.11(b), prison officials developing an inmate's financial responsibility plan "shall exclude from its assessment $50 a month deposited into the inmate's trust fund account.... This $50.00 is excluded to allow the inmate the opportunity to better maintain telephone communication under the Inmate Telephone System (ITS)." 59 Fed.Reg. 15825 (Apr. 4, 1994). The new regulation also increases the number of calls allowed to an inmate who refuses to participate in the financial responsibility program. Whereas the previous policy of the Bureau of Prisons was to limit such non-participants to one phone call every *three months,* 28 CFR § 545.11(d)(10) now provides that, effective January 3, 1995, the inmate "will be allowed to place no more than one telephone call every month...."

## II.

■ We review a challenge to the granting of a preliminary injunction under the abuse of discretion standard. *Keweenaw Bay Indian Community v. Michigan,* 11 F.3d 1341, 1348 (6th Cir.1993). Because a trial court's decision to grant a preliminary injunction is accorded such great deference, we will disturb such a decision only if the district court "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991).

---

**6.** Pursuant to the provisions of 28 CFR § 540.-105(b), "[a]n inmate without funds is defined as an inmate who has not had a trust fund account balance of $6.00 for the past 30 days." In explaining the choice of the $6.00 figure, the Bureau of Prisons noted:

> The $6.00 ceiling was selected because it is above the maintenance pay level. Maintenance pay, which is currently $5.25 per month,

is the lowest pay grade for inmates at Bureau institutions. By defining "inmates without funds" as an inmate who has not had a trust fund account balance for the past 30 days of $6.00, the regulations ensure that inmates who are in the lowest pay grade and who lack outside sources of income will be able to make some collect telephone calls.

59 Fed.Reg. 15821–15822 (Apr. 4, 1994).

## III.

The factors to be considered by a district court in deciding whether to grant a preliminary injunction are well established in this circuit. In making that determination, a court must consider: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction. *Keweenaw Bay Indian Community*, 11 F.3d at 1348. As we have previously held, however, "the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required to support a grant of a preliminary injunction may depend on the strength of the other factors considered." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985).

### A.

A determination of the plaintiffs' likelihood of success on the merits of their claims ordinarily would require an examination of each of the bases for relief put forth in this proceeding. Because of the promulgation by the Bureau of Prisons of the final rule found at 59 Fed.Reg. 15812–25 (Apr. 4, 1994), however, the plaintiffs conceded at oral argument in this matter that their due process and Administrative Procedures Act claims are no longer relevant as bases for entry of a preliminary injunction. Consequently, we need to discuss the merits only of the plaintiffs' claim that the operation of the restricted direct dial telephone system in the federal correctional institutions, as amended by the promulgation of the final rule in 59 Fed.Reg. 15812–25 (Apr. 4, 1994), has a chilling effect on the inmates' and intervening plaintiffs' rights to free speech, and the claim that use of Commissary Fund monies to install and operate the new direct dial system violates statutory provisions concerning the proper use of the Fund.

### 1.

In its "Findings of Fact and Conclusions of Law Regarding Preliminary Injunction," the district court determined that the plaintiffs had shown a substantial likelihood of success on the merits of their First Amendment claim. In particular, the district judge noted that he had "serious questions concerning the constitutionality of the ITS. The phone list requirement and its limitation as to 'ordinarily' only listing 'family or friends' without prior approval from the Bureau raises serious prior restraint concerns." Not unexpectedly, the defendants disagree with the district court's assessment of the plaintiffs' chances for success on this issue.

The defendants first insist that inmate use of a telephone is not a right at all, but merely a privilege extended by the correctional facility to foster continued communication with family and friends outside the prison walls. In any event, the defendants argue, implementation of a direct-dialing system does not violate a right of free expression and association because any restrictions imposed are "reasonably related" to legitimate penological interests[7], because the restrictions are content-neutral and are unrelated to the purpose of suppressing expression, and because inmates may still communicate with family and friends through alternate means of expression such as prison visits and letters.

The Supreme Court has recognized that " '[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution,' *Turner v. Safley*, 482 U.S. [78] at 84 [107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)] ..., nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside,' *id.*, at 94–99 [107 S.Ct. at 2265–

---

7. The plaintiffs contend that the defendants are advocating application of an incorrect standard for constitutional review of the Bureau of Prisons telephone system. According to the plaintiffs, this Court should not examine the record to determine whether any restrictions resulting from implementation of the ITS system are "reasonably related to legitimate penological interests." Instead, they argue that the defendants must identify a "substantial interest of penal administration" to justify the infringement upon the plaintiffs' constitutional rights.

67]. . . ." *Thornburgh v. Abbott*, 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989). In fact, federal court opinions have previously held that persons incarcerated in penal institutions retain their First Amendment rights to communicate with family and friends, *Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir.1975), and have recognized that "there is no legitimate governmental purpose to be attained by not allowing reasonable access to the telephone, and . . . such use is protected by the First Amendment." *Johnson v. Galli*, 596 F.Supp. 135, 138 (D.Nev.1984).

■ Nevertheless, an inmate "has no right to unlimited telephone use." *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir.), *cert. denied*, 493 U.S. 895, 110 S.Ct. 244, 107 L.Ed.2d 194 (1989), *citing Lopez v. Reyes*, 692 F.2d 15, 17 (5th Cir.1982). Instead, a prisoner's right to telephone access is "subject to rational limitations in the face of legitimate security interests of the penal institution." *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir.1986). "The exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions." *Fillmore v. Ordonez*, 829 F.Supp. 1544, 1563–64 (D.Kan.1993), *aff'd*, 17 F.3d 1436 (10th Cir. 1994), and *citing Feeley v. Sampson*, 570 F.2d 364, 374 (1st Cir.1978), and *Jeffries v. Reed*, 631 F.Supp. 1212, 1219 (E.D.Wash. 1986).

While the mere replacement of the prisons' collect-call telephone system with a direct-dial telephone system may not by itself implicate the plaintiffs' First Amendment rights, restrictions placed upon the inmates' correspondence with other individuals outside the prison walls must also be examined to deter-mine whether those requirements unconstitutionally restrict the free speech of the intervening plaintiffs. Of particular concern to the district judge in this case was the prior requirement by the Bureau of Prisons that inmates list the 20 persons they wish to call and the requirement that individuals on those lists who are not family members or visiting friends of the inmates complete and return a form to the Bureau before being eligible for inclusion on the lists.

The concerns expressed by the district judge have, however, been largely eliminated by the promulgation of the amendments to 28 CFR § 540. Inmates may now list 30 phone numbers on their call lists and additional numbers may be added, at the discretion of prison authorities, if legitimate justification for supplementing the list can be provided. Furthermore, the Request for Telephone Privilege Form that offensively sought personal information from potential call recipients has been abandoned by the Bureau, and phone numbers listed by inmates are now "ordinarily" placed on the approved call lists unless a potential recipient specifically requests in writing to be stricken from the list. Moreover, supplemental evidence presented to this court establishes that prison authorities may not now, without justification, routinely eliminate courts, elected officials, and members of the news media from inmate call lists.

The recent Bureau regulation concerning inmate use of the prison telephone system addressed and remedied the prior restraint concerns identified by the district judge in this case. The amendment of applicable prison regulations by the Bureau has thus substantially lessened the likelihood that the plaintiffs could succeed on the merits of their existing First Amendment claims.[8]

---

**8.** Furthermore, it is now unnecessary to decide whether the government must establish only that any restriction on an inmate's constitutional rights "is reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (deferential standard applied to communication *entering* a correctional institution), or whether the government must show both that the regulation furthers "an important or substantial governmental interest unrelated to the suppression of expression" and that the limitation on First Amendment freedoms is "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974) (stricter standard applied to correspondence from inmates to individuals *outside* the correctional institution) (overruled as standard to be applied to incoming correspondence in *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

## 2.

█ The plaintiffs also allege that the financing of certain salaries and other expenses connected with the installation and operation of the ITS system from the Commissary Fund violates the statutory provisions regarding that pool of money. The Commissary Fund, comprised of profits from the sale of "articles" at the prison commissaries, is termed a "trust fund" by the provisions of 31 U.S.C. § 1321(a)(22). Furthermore, 31 U.S.C. § 1321(b) provides that "[a]mounts accruing to [the Commissary Fund] . . . are appropriated to be disbursed in compliance with the terms of the trust." Those trust terms are contained in Department of Justice Circular 2244 entitled "Rules Governing the Control of Prisoners['] Funds at the Several Penal and Correctional Institutions" (1932), and provide that "[w]ith approval of the Director, Bureau of Prisons, the 'Welfare Fund' may be disbursed on written order of the Warden for any purpose accruing to the benefit of the inmate body, as a whole, such as amusements, education, library, or general welfare work." Circular 2244, ¶ 41.

The plaintiffs contend that the expenditures from the Commissary Fund for installation and support of the new system are not for the benefit of the entire inmate body and, therefore, should not be made from the statutorily protected trust fund. In its injunction order, the district court also concluded that the trust fund could not be used for ITS-related expenses because "[t]he ITS, as it is being implemented by the Bureau, plainly discriminates against indigent inmates as well as non-[inmate financial responsibility program] participants. This discrimination likely represents a breach of fiduciary duty under the trust because trust funds are not being spent impartially for the benefit of all inmates as the trust terms require."

The promulgation of the amendments to 28 CFR §§ 540 and 545, by significantly increasing the availability of collect phone calls in certain situations in comparison with the collect calls available under the initial Bureau of Prisons ITS proposal, resolves in large measure the complaint that the new telephone system improperly discriminated against indigent inmates and those not participating in the inmate financial responsibility program. The plaintiffs still assert, however, that money from the trust fund spent on the ITS system has been misappropriated because ITS is not an item purchased for the general welfare of all inmates. Furthermore, the injunction order of the district court notes that the prison security function performed by Commissary Fund-financed ITS purchases and salaries directly violates statutory directives that such functions be funded from the United States Treasury.

█ The defendants argue in response that the plaintiffs have no standing to contest expenditures from the Commissary Fund because the inmates are not entitled to any particular distribution from that Fund. The defendants also contend that installation of an improved telephone system that lowers the per-call-cost of telephone communication for the inmates is a benefit to the prison community as a whole and thus complies with the terms of the trust. The fact that certain individuals may be unable to make as many calls as they could previously and may, therefore, not favor ITS does not mean the inmates as a whole are not benefitted by the system. Similarly, argue the defendants, the fact that some inmates cannot read or choose not to engage in athletic diversions does not mean that expenditures from the Commissary Fund for library materials or athletic equipment are not made for the benefit of the prison population as a whole. Furthermore, the defendants submit that the testimony offered before the district judge indicated that the Commissary Fund monies were used only for the benefit of the prison inmates and were not used to purchase, install, or operate any call-monitoring equipment associated with the use of the ITS system.

The defendants' standing argument misapprehends the thrust of the inmates' Commissary Fund claim. The plaintiffs readily concede that they are not entitled to demand that distributions from the trust fund be made at any particular time for any particular purpose. As even the defendants recognize, however, "plaintiffs can assert standing to attack [the Bureau's] use of the Commis-

sary Fund ... if they can show that this *method of funding* causes them injury that would be redressed, in a non-speculative way, by an order precluding use of Fund money in this way." To the extent that the inmates can make such a showing, therefore, the plaintiffs do have standing to contest the depletion of the Commissary Fund.[9]

In light of the recent amendments to the applicable regulatory provisions regarding prison telephone use, the plaintiffs may not be able to show that ITS itself does not benefit the general prison population as a whole. In fact, the very existence of *any* system allowing telephonic communication with individuals outside the prison system can be viewed as a substantial benefit to the prison population as a whole. Moreover, a system such as ITS that can lower the cost of calls made by the inmates accords yet an additional benefit to the plaintiffs. Also, although funds for the ITS system will initially decrease the balance in the Commissary Fund, evidence before the district court established that, once fully operational, the ITS system, based on purchases of phone "credits" from the prison commissaries, will actually result in a net *profit* for the Commissary Fund.

The plaintiffs still seek, however, to demonstrate that Fund monies have been expended for *aspects* of the operation of the ITS system in direct violation of applicable federal statutes. Particularly, the plaintiffs point to 18 U.S.C. § 4007 which provides:

> The expenses attendant upon the confinement of persons arrested or committed under the laws of the United States, as well as upon the execution of any sentence of a court thereof respecting them, shall be paid out of the Treasury of the United States in the manner provided by law.

As argued by the plaintiffs, one such expense attendant upon the confinement of prisoners, which, therefore, must be funded from the United States Treasury, is for the security of the penal institution and of the general public.

According to the testimony of Michael Atwood, the chief of the Trust Fund Branch of the Bureau of Prisons, however, "[t]he Trust Fund did purchase some [ITS equipment] that does do live monitoring" of inmate calls. Atwood was thus forced to concede that the fund has, in fact, been utilized for "a security purpose." Despite that concession, Atwood readily claimed that the monitoring equipment also has been used "for diagnostic purposes if we were to get a complaint that, you know, there are certain amounts of static on the line or there's messages that come up when an inmate dials a certain number, those types of things."

Such dual purposes of the trust fund expenditures require a court to examine closely the primary function of the questioned purchase or operation. If the overriding purpose of an expenditure is to provide for the amusement, education, library, or general welfare of the inmate population, the fact that the expenditure also incidentally serves a security or monitoring function may be irrelevant. If, however, evidence establishes that the primary purpose of goods or services obtained with trust fund money is to provide for responsibilities "attendant upon the confinement of persons" housed in federal correctional facilities, such illegal invasions of the trust must be enjoined. Otherwise, "security costs" that were expended from the Commissary Fund, even if they may have also served a legitimate phone system function, will improperly deplete the balance of funds ultimately available to the inmates for other purposes.

Given the sweeping changes made in the ITS system since the issuance of the district court's injunction, the plaintiffs may not be able to demonstrate a substantial likelihood of success on the merits of their claim that the Commissary Fund may not be used to finance *any* portion of the new phone system. To the extent, however, that the fund is irreparably and illegally depleted for the primary purposes of prison security and inmate control, the inmates, the beneficiaries of the

**9.** The Restatement (Second) of Trusts §§ 199–200 (1959) makes clear that the beneficiary of a trust, and no one except a beneficiary of a trust, can maintain a suit against the trustee to enjoin breaches of the trust or to obtain redress for a prior breach of trust. Moreover, "[i]f there are several beneficiaries of a trust, any beneficiary can maintain a suit against the trustee to enforce the duties of the trustee ... or to enjoin or obtain redress for a breach of the trustee's duties...." Restatement (Second) of Trusts § 214(1) (1959).

trust fund, can show that a limited injunction should issue to deter such violations by the trustee.

### B.

Any perceived harm in this case to the plaintiffs' First Amendment, due process, or administrative statutory rights has been cured by the final promulgation of amendments to 28 CFR §§ 540 and 545. Those amendments so altered the existing ITS guidelines in response to proper rulemaking procedures that the plaintiffs' and intervening plaintiffs' concerns regarding alleged constitutional and statutory violations have been adequately addressed or mooted. Again, however, to the extent that injunctive relief does not prohibit further depletion of the Commissary Fund for expenditures for security measures, the plaintiffs, as beneficiaries of the Fund, lose forever the monies that can legally be expended only for their general welfare. Such a loss, although conditioned on actions by others, is still an "injury in fact" to the plaintiffs that can be remedied by injunctive relief.

### C.

Moreover, entry of injunctive relief prohibiting the defendants from spending Commissary Fund monies in violation of applicable statutory restraints does not harm those defendants. If the proof at trial establishes that unauthorized expenditures are being made from the Commissary Fund, a restriction on such spending will only place the defendants in the position in which they should have been initially—the position of requesting from Congress sufficient appropriations to fund the duties "attendant upon the confinement of persons arrested or committed under the laws of the United States."

### D.

Finally, entry of a limited injunction to prevent the use of Commissary Fund monies to finance the security functions of the federal penal institutions will not in any way harm the public interest. Although forcing the Bureau of Prisons to fund security monitoring of telephone calls through proper appropriations channels may result in a greater drain on the government's finances, the responsibility for such security features does in fact rest with the government. Moreover, the relatively minor increase in Congressional appropriations necessary to replace the monies improperly diverted from the Commissary Fund does not outweigh the greater public interest in having governmental agencies abide by the federal laws that govern their existence and operations.

### IV.

■ In a second issue, the defendants insist that the district court's nationwide injunction was overly broad. In support of their position, the defendants cite *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir.1983), for the proposition that an "injunction must be limited to apply only to the individual plaintiffs unless the district court certifies a class of plaintiffs." Because the order of injunction in this case was entered on October 13, 1993, more than one month before the November 18, 1993, order certifying the nationwide plaintiff class of federal inmates, the defendants argue that any injunction in this matter should be limited to the named plaintiffs incarcerated at the Lexington, Kentucky, federal medical correctional facility.

The plaintiffs recognize that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979). They submit, however, that a nationwide injunction covering all federal correctional institutions is necessary in order to grant effective relief on their Commissary Fund claim.

Especially given the limited extent of relief properly granted by the district court in this case, in light of administrative developments subsequent to issuance of the preliminary injunction, it cannot be successfully argued that a nationwide injunction was improper. Even in *Zepeda*, the Ninth Circuit admitted that prior caselaw, although sometimes misinterpreted, properly concluded that it may be, in some cases, "unnecessary to certify a class because the relief necessary to remedy [the wrong] for individual plaintiffs would be identical to that necessary for a class." *Zepeda v. INS*, 753 F.2d at 728 n. 1, *citing*, *Bailey v. Patterson*, 323 F.2d 201, 206 (5th Cir.1963), *cert. denied*, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964). Likewise, in this

case, the appropriate relief to be granted to the plaintiffs on their Commissary Fund claim necessarily implicates nationwide relief.

The inmates at federal correctional facilities throughout the country are the beneficiaries of the Commissary Fund. Although the inmates themselves cannot determine when distributions from the Fund should be made or for what purpose such distributions should be made, they remain, according to the provisions of the Department of Justice's own circular, the sole beneficiaries of the trust. Moreover, that Fund cannot be depleted by the Bureau of Prisons for the financing of security measures that are properly chargeable only to the United States Treasury. 18 U.S.C. § 4007. The named plaintiffs' gains in obtaining an injunction prohibiting further invasions of the trust for the primary purpose of installing security equipment would be illusory indeed if the defendants were banned from funding security measures through the Commissary Fund at the Lexington facility only, but could finance those same measures at other institutions through invasions of Fund accounts. Because relief for the named plaintiffs in this case would also necessarily extend to all federal inmates, the district court did not err in granting wide-ranging injunctive relief prior to certifying a nationwide class of plaintiffs. *Bailey v. Patterson, supra.*

### V.

Promulgation of final regulations regarding federal inmate telephone usage has allayed many of the concerns of the plaintiffs that precipitated the filing of this lawsuit. Consequently, the plaintiffs can no longer establish the substantial likelihood of success on the merits of their claims that is required to support issuance of a preliminary injunction on those grounds. The new regulations promulgated by the Bureau of Prisons do not, however, necessarily affect that portion of the district court's injunction that forbids financing of security measures for the prisons through withdrawals from the trust fund established from profits from commissary sales. Because a nationwide injunction forbidding encroachment on that fund by the Bureau for unauthorized expenditures is the only way to preserve the integrity of the fund pending final resolution of the issues raised in this lawsuit, we conclude that the district court did not abuse its discretion in preliminarily enjoining the defendants from using the Commissary Fund to finance the purchase, installation, or operation of the ITS system *to the extent that those funds are primarily used to support the security function of the penal institutions.*

We order, therefore, that the district court's preliminary injunction be **MODIFIED** to prohibit only statutorily unauthorized purchases or expenditures from the Commissary Fund. In all other respects, the preliminary injunction is **DISSOLVED.** This matter is **REMANDED** to the district court for further proceedings consistent with this opinion. If, during those proceedings, the district court determines that the primary purpose of the ITS equipment and operations purchased with Commissary Fund money is to benefit the general prison population, rather than to provide additional security measures at federal correctional facilities, then even the remaining portion of the preliminary injunction should be dissolved pending final resolution of the plaintiffs' complaints on the merits.