LUXOTTICA GROUP S.p.A.,
et al., Plaintiffs,

v.

The UNITED STATES SHOE
CORPORATION, et al.,
Defendants.

No. C2–95–244.

United States District Court,
S.D. Ohio,
Eastern Division.

March 16, 1995.

Thomas Brennan Ridgley and Laura G. Kuykendall, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Plaintiffs.

Joseph J. Dehner, Frederick J. McGavran and Adam P. Hall, Frost & Jacobs, Cincinnati, Ohio, Michael Karl Yarbrough, Frost & Jacobs, Columbus, Ohio, for Defendant, United States Shoe Corp.

Samuel H. Simon and Daniel Allen Malkoff, Ohio Attorney General, Columbus, Ohio, for Defendant, State of Ohio.

## OPINION AND ORDER

GRAHAM, District Judge.

This matter is before the Court on plaintiffs' motion for an order preliminarily and permanently enjoining defendants from applying Ohio Revised Code § 1701.01(CC)(2) to a shareholders' meeting of defendant United States Shoe Corporation ("U.S. Shoe") scheduled to be held on April 21, 1995.

In December of 1994, plaintiffs Luxottica Group, S.p.A., Luxottica Acquisition Corporation and Avant–Garde Optics, Inc. ("Luxottica") initiated negotiations with the management of U.S. Shoe to acquire all the outstanding shares of the corporation through a cash tender offer. Negotiations collapsed when plaintiffs and U.S. Shoe were unable to reach agreement on the terms of a standstill. On March 3, 1995, plaintiffs commenced a $1.2 billion nationwide cash tender offer directly to U.S. Shoe's shareholders at a price of $24 per share. U.S. Shoe is incorporated in the state of Ohio and maintains its principal executive offices in Cincinnati, Ohio. Its stock is registered with the Securities and Exchange Commission and is traded on the New York and Pacific Stock Exchanges.

In determining whether a motion for preliminary injunction should be granted, a court must consider and balance four factors: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the

injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction. *Washington v. Reno,* 35 F.3d 1093, 1099 (6th Cir.1994); *International Longshoremen's Assoc. v. Norfolk S. Corp.,* 927 F.2d 900, 903 (6th Cir.1991).

Ohio Revised Code § 1701.831, part of Ohio's General Corporation Law, regulates "control share acquisitions."[1] Plaintiffs' tender offer proposes a control share acquisition within the meaning of the Ohio Act. The Act provides that any control share acquisition "shall be made only with the prior authorization of the shareholders of such corporation in accordance with this section." § 1701.831(A). Any person who proposes to make a control share acquisition is required to deliver an acquiring person statement to the corporation containing certain specified information. § 1701.831(B). Within ten days after the receipt of an acquiring person statement, the directors of the corporation must call a special meeting of shareholders (the "831 meeting") to vote on the proposed control share acquisition. § 1701.831(C). Unless the acquiring person agrees to another date, the 831 meeting must be held within fifty days after receipt of the acquiring person statement. *Id.* The proposed acquisition can be consummated only if the shareholders who hold shares entitling them to vote in the election of directors authorize the acquisition at the 831 meeting by an affirmative vote of a majority of the voting power of the corporation in the election of directors represented at the meeting in person or by proxy and by a majority of the portion of such voting power excluding the voting power of "interested shares" as defined in Ohio Revised Code § 1701.01(CC). A quorum must be present at the 831 meeting and will be deemed present if a majority of the voting power of ⁺he corporation in the election of directors and a majority of such voting power excluding "interested shares," are represented at the meeting in person or by proxy. § 1701.831(E)(1). According to Ohio Revised Code § 1701.832, these procedures are in-

tended to provide "... even handed protection of offerors and shareholders from fraudulent and manipulative transactions arising in connection with control acquisition."

In 1990, the Ohio General Assembly amended § 1701.01(CC) to create a new class of interested shares. It did so by enacting § 1701.01(CC)(2) which disqualifies any shares acquired during the period beginning with the date of the first public disclosure of the proposed acquisition and ending on the date of the 831 meeting if the aggregate consideration paid for such shares exceeds $250,000 or the number of shares acquired exceeds one-half of one percent of the outstanding shares of the corporation entitled to vote in the election of directors. This provision was apparently intended to include shares purchased by arbitrageurs within the definition of interested shares because it was felt that they would usually align themselves with the offeror in voting on the approval of an acquisition. It is this provision and only this provision of the Ohio Control Share Acquisition Act which plaintiffs challenge in the instant motion. District court decisions in both the Northern District and the Southern District of Ohio hold that other provisions of the Ohio Act would likely withstand challenge under the supremacy clause and the commerce clause. *See Veere Inc. v. Firestone Tire & Rubber Co.,* 685 F.Supp. 1027 (N.D.Ohio 1988) and *CEIC Holding Co. v. Cincinnati Equitable Ins. Co.,* No. C–1–84–1587, 1984 WL 2922 (S.D.Ohio, November 8, 1984) (LEXIS, Genfed Library, Dist. file). Plaintiffs do not challenge the concept of including arbitrageurs in the definition of interested shares, their challenge is based on how the statute impacts their ability to consummate a tender offer.

■ Plaintiffs assert that § 1701.01(CC)(2) is preempted by federal law. A state statute is void to the extent that it actually conflicts with a valid federal statute in the sense that compliance with both federal and state regulations is a physical impossibility or the state law stands as an obstacle to the accomplish-

---

1. This term is defined in Ohio Revised Code § 1701.01(Z)(1) as the acquisition of sufficient shares of a corporation so as to position the acquirer to exercise voting power in the election

of directors within one of three ranges: one-fifth or more but less than one-third; one-third or more but less than a majority; and a majority of such voting power.

ment and execution of the full purposes and objectives of Congress. *Edgar v. MITE Corp.,* 457 U.S. 624, 631, 102 S.Ct. 2629, 2634–35, 73 L.Ed.2d 269 (1982).

█ · The Williams Act, 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f) prescribes rules for tender offers. The Williams Act, backed by regulations of the SEC, imposes requirements in two basic areas. First, it requires the offeror to file a statement disclosing information about the offer. Second, the Act, and the regulations that accompany it, establish procedural rules which govern tender offers. For example, stockholders who tender their shares may withdraw them while the offer remains open and, if the offeror has not purchased their shares, anytime after 60 days from commencement of the offer. The offer must remain open for at least twenty business days. One of the purposes of the Williams Act is to avoid undue delay in the consummation of tender offers. *Edgar v. MITE Corp.,* 457 U.S. 624, 637, 102 S.Ct. 2629, 2638, 73 L.Ed.2d 269 (1982). As Justice White noted in *MITE,* Congress reemphasized this purpose when it enacted the Hart–Scott–Rodino Anti–Trust Improvements Act of 1976, 15 U.S.C. § 12 *et seq.,* and to demonstrate this point, he quoted from the legislative history of that Act:

> This ten-day waiting period thus underscores the basic purpose of the Williams Act—to maintain a neutral policy towards cash tender offers, by avoiding lengthy delays that might discourage their chances for success.

*Id.* at 638, 102 S.Ct. at 2638.

In *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 85, 107 S.Ct. 1637, 1647, 95 L.Ed.2d 67 (1987), five years after the decision in *MITE,* Justice Powell, writing for the majority of the court said:

> Nothing in *MITE* suggested that *any* delay imposed by state regulation, however short, would create a conflict with the Williams Act. The plurality argued only that the offeror should 'be free to go forward without *unreasonable* delay'. 457 U.S. at 639, 102 S.Ct. at 2639 (emphasis added).

Although the court in *CTS Corp.* emphasized the purpose of the Williams Act identified in *Piper v. Chris–Craft Industries,* 430 U.S. 1, 30, 97 S.Ct. 926, 943, 51 L.Ed.2d 124 (1977) "... plac[ing] investors on an equal footing with the takeover bidder" it did not disavow that the accomplishment of that purpose would include the avoidance of unreasonable delays in the consummation of a tender offer. In *CTS Corp.,* the court upheld an Indiana statute which did impose an additional delay in the consummation of a tender offer but the court was careful to note that the period was still within the sixty day period established by Congress for the reinstitution of withdrawal rights under the Williams Act. This Court concludes that unlike the Indiana statute under consideration in *CTS Corp.,* § 1701.01(CC)(2) of the Ohio Act imposes an unreasonable delay beyond the sixty day period established for the reinstitution of withdrawal rights under the Williams Act and that accordingly this provision of the Ohio law is preempted by the Williams Act.

The Court reaches this conclusion because it believes there are two significant flaws in § 1701.01(CC)(2) which result in unreasonable delay. The first flaw is the definition of disqualification in terms of shares as opposed to persons. The second flaw is the provision ending the period for determining disqualification on the date of the 831 meeting instead of the record date for that meeting.

Section 1701.01(CC)(2) provides as follows:

(2) "Interested shares" also means any shares of an issuing public corporation acquired, directly or indirectly, by any person from the holder or holders thereof for a valuable consideration during the period beginning with the date of the first public disclosure of a proposed control share acquisition of the issuing public corporation or any proposed merger, consolidation, or other transaction which would result in a change in control of the corporation or all or substantially all of its assets, and ending on the date of any special meeting of the corporation's shareholders held thereafter pursuant to section 1701.831 [1701.83.1] of the Revised Code, for the purpose of voting on a control share acquisition proposed

by any acquiring person if either of the following apply:

(a) The aggregate consideration paid or given by the person who acquired the shares, and any other persons acting in concert with him, for all such shares exceeds two hundred fifty thousand dollars;

(b) The number of shares acquired by the person who acquired the shares, and any other persons acting in concert with him, exceeds one-half of one per cent of the outstanding shares of the corporation entitled to vote in the election of directors.

The disqualification for the purposes of determining a quorum of non-interested shares and for voting at the 831 meeting applies to shares not persons. This makes it impossible to determine at the 831 meeting which shares are interested and which shares are not and thus, impossible to determine whether a quorum of non-interested shares is present and whether a majority of non-interested shares have voted in favor of the acquisition. The information needed to determine whether shares are interested would not be available to the inspector of elections through any accessible or verifiable public or private records. Well over half of the shareholders of U.S. Shoe hold their shares in street name, i.e., the owner of record is a bank or brokerage house. Neither U.S. Shoe nor plaintiffs can compel record holders to disclose the name, address or holdings of beneficial owners who wish such information to remain confidential, neither can they obtain information regarding the price they paid or the date on which their shares were purchased.

Nor could an inspector of elections rely on information solicited from shareholders since under the definition of interested shares there are circumstances in which shareholders, regardless of their bona fides, would be unable to tell whether their shares were disqualified. The Board of U.S. Shoe has set April 21st as the date for the 831 meeting and has set a record date of March 21st for that meeting. A shareholder who owns stock on the record date is entitled to vote at the meeting. If such a shareholder should sell any of his or her shares after the record date but before the meeting, such shareholder would not know whether the purchaser of the shares had purchased more than $250,000 worth of shares since the announcement of the tender offer. Thus, it would be impossible to reliably ascertain at the 831 meeting whether the required quorum was present or whether a majority of non-interested shares had voted in favor of the acquisition.

An even more basic problem which will unquestionably cause delay in the consummation of a tender offer well beyond the parameters set by the Williams Act arises from the provision of § 1701.01(CC)(2) which states that the determination of disqualification extends from the period of the first public disclosure through the date of the 831 meeting. This provision renders the record date set pursuant to Ohio Rev.Code § 1701.45 meaningless since share transactions which occur after the record date are still counted for the purposes of disqualification. In effect, the date of the 831 meeting becomes the record date for the purpose of determining whether shares are interested or not under § 1701.01(CC)(2). It is undisputed that it would take at least four weeks after that date to solicit the shareholders who appeared at the 831 meeting in person or by proxy to obtain the information necessary to determine their status under § 1701.01(CC)(2). Even then, as noted above, in many instances the information would be incapable of verification by the inspector of elections.

This scheme is fraught with the potential for delays well beyond the four week period needed to obtain information from shareholders. Since the drafters of the statute apparently did not appreciate that ending the period of disqualification on the date of the 831 meeting instead of the record date would require a second solicitation of shareholders to determine what shares are interested shares under § 1701.01, they did not provide any procedures or any time limits for accomplishing this. We know that it will take at least four weeks from the date of the 831 meeting to attempt to obtain the information from shareholders which is necessary to determine whether the shares are interested or non-interested under § 1701.01(CC)(2). That means it would take until May 19th to obtain the information. That is nearly three weeks beyond the deadline for reinstituting

withdrawal rights under the Williams Act. Just how much longer it will take to certify the results of that meeting is unknown because there are no procedures or time limits prescribed for doing so.

The Court finds that it would be impossible to comply with § 1701.01(CC)(2) within the sixty day period for reinstituting withdrawal rights under the Williams Act and that compliance with this particular provision of the Ohio Control Share Acquisition Act would frustrate the Congressional purpose of preventing undue delay in the consummation of a tender offer.

Defendants argue that the Court should construe § 1701.01(CC)(2) so that it would be possible to determine the status of shares as interested or non-interested by the time of the 831 meeting. They argue that the court can do so by construing "interested shares" to mean "interested shareholders" and by reading the phrase "ending on the date of any special meeting" to mean "ending on the record date of any special meeting." This would not be construing or interpreting the statute, it would be rewriting the statute which is beyond the Court's authority.

Turning to plaintiffs' contention that § 1701.01(CC)(2) violates the Commerce Clause of the Federal Constitution, the Court concludes that in light of Part III of the court's decision in *CTS Corp.* that contention must be rejected. Plaintiffs argue further that § 1701.01(CC)(2) is invalid because it gives an advantage to later offerors in a tender offer contest and that the statute has a disparate impact on the first offeror. As stated above, the statute provides that purchasers who accumulate more than $250,000 or .5 percent of the outstanding shares of a corporation after announcement of a tender offer are disqualified from voting on that offer. Plaintiffs point out that those same shares would not be disqualified from voting on a later offer. Assuming that the statute could in some circumstances give an advantage to later offerors, the Court is aware of no statutory or constitutional provision which would require a state to treat competing offerors evenhandedly. Any impact on an original offeror is an incidental effect of a statute which is otherwise constitutional and this particular aspect of the statute does not conflict with the provisions or purposes of the Williams Act or any other federal law.

■ Finally, plaintiffs argue that § 1701.01(CC)(2) violates the Contracts Clause and the Due Process Clause of the United States Constitution. Plaintiff argues that this is so because the statute overrides the provisions of U.S. Shoe's articles of incorporation which state that "all shares of any particular series shall rank equally and be identical in all respects" and that each common share entitles its holder to "one vote on each matter properly submitted to the shareholders for their vote." The Court finds no merit in these arguments. In upholding an Indiana statute that stripped "control shares" of voting rights unless restored by a majority vote of non-interested shareholders, the Supreme Court in *CTS Corp.* said:

> The primary purpose of the Act is to protect the shareholders of Indiana corporations. It does this by affording shareholders, when a takeover offer is made, an opportunity to decide collectively whether the resulting change in voting control of the corporation, as they perceive it, would be desirable. A change of management may have important effects on the shareholders' interests; it is well within the State's role as overseer of corporate governance to offer this opportunity.

481 U.S. at 91, 107 S.Ct. at 1651. A person buying U.S. Shoe shares on or after March 3, 1995 took them subject to the rights they have under Ohio law, including the provisions of Ohio's Control Share Acquisition Act. Thus, § 1701.01(CC)(2) does not operate as a "substantial impairment of a contractual relationship," *see Allied Structural Steel Corp. v. Spannaus,* 438 U.S. 234, 244–45, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978). Furthermore, the statute accomplishes a significant and legitimate public purpose. *See Energy Reserves Group v. Kansas Power & Light Co.,* 459 U.S. 400, 411–12, 103 S.Ct. 697, 704–705, 74 L.Ed.2d 569 (1983). For the same reasons, the Court finds plaintiffs' due process argument unavailing.

Defendants argue that plaintiffs' challenge to § 1701.01(CC)(2) is not ripe for judicial review because it may be possible for U.S.

Shoe to comply with its provisions without incurring undue delay. This argument is based largely on the premise that the statute can be construed to permit the determination of the status of shares prior to the 831 meeting, a premise the Court has rejected. The Court has concluded that U.S. Shoe cannot comply with the requirements of § 1701.01(CC)(2) without unreasonably delaying plaintiffs' tender offer contrary to the purpose of the Williams Act. Uncertainty about the ground rules for the 831 meeting set for April 21st in itself is likely to cause irreparable injury to plaintiffs in their attempts to consummate their tender offer. The injury to plaintiffs is not hypothetical but real and plaintiffs' challenge to § 1701.01(CC)(2) is ripe for judgment review.

Having concluded that § 1701.01(CC)(2) is preempted by the Williams Act, the Court concludes that plaintiffs are likely to succeed on the merits. The Court further finds that the application of § 1701.01(CC)(2) to plaintiffs' tender offer and in particular, its application to the 831 meeting scheduled for April 21, 1995 and the proxy solicitations for that meeting present plaintiffs with the risk of irreparable harm for which they have no adequate remedy at law. The nature of the harm to a tender offeror which results from any delay was described in detail in *MITE, see* 457 U.S. at 637, 638 n. 12, 13, 102 S.Ct. at 2638 n. 12, 13. In contrast neither U.S. Shoe or any other person will suffer any legally cognizable harm if a preliminary injunction is granted barring the application of § 1701.01(CC)(2). Finally the public interest favors granting preliminary injunctive relief since the public policy which controls in the case is the one set by Congress when it enacted the Williams Act. Accordingly, plaintiffs are entitled to a preliminary injunction barring the defendants from applying the provisions of § 1701.01(CC)(2) to plaintiffs' tender offer.

It is so ORDERED.