**UNITED DOMINION INDUSTRIES LIMITED, et al., Plaintiffs,**

v.

**COMMERCIAL INTERTECH CORP., et al., Defendants.**

No. C2–96–672.

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 13, 1996.

 

Thomas B. Ridgley, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for plaintiffs.

John W. Edwards II, Jones, Day, Reavis & Pogue, Cleveland, Ohio, J. Kevin Cogan and Todd S. Swatsler, Jones, Day, Reavis & Pogue, Columbus, Ohio, Marc P. Cherno, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant, Commercial Intertech.

Stephen H. Johnson, Assistant Attorney General, Columbus, Ohio, for defendants, State of Ohio, Donna Owens and Thomas Geyer.

## OPINION AND ORDER

GRAHAM, Judge.

### STATEMENT OF FACTS

Plaintiff United Dominion Industries Limited ("United Dominion") is a corporation organized under the laws of Canada with its principal place of business in Charlotte, North Carolina. Opus Acquisition Corporation, the other plaintiff, is a wholly-owned subsidiary of United Dominion, which also has its principal place of business in Charlotte, North Carolina, but unlike its parent is organized under the laws of Delaware. Defendant Commercial Intertech Corp. ("CIC") is an Ohio corporation with its principal executive offices in Youngstown, Ohio. Its stock is registered with the Securities and Exchange Commission and traded on the New York and Pacific Stock Exchanges. The directors of CIC have also been individually named as defendants. Finally, the following Ohio officials appear as defendants: Thomas Geyer, the Acting Commissioner of the Division of Securities, Department of Commerce; Donna Owens, Director of Commerce; and Betty Montgomery, the Attorney General ("state defendants").

On July 11, 1996, after a lukewarm response by CIC's directors to United Dominion's offer to acquire CIC by an all-cash merger, United Dominion commenced a nationwide tender offer for all of the outstanding shares of CIC's common stock at a price

of $27 per share, which, at the time, was above the current market price for the stock. On the next day plaintiffs filed the present action in this Court.

This matter is before the Court on plaintiffs' motion for an order preliminarily and permanently enjoining defendants from applying Ohio Rev.Code § 1701.01(CC)(2) to a meeting of shareholders of CIC scheduled to be held on August 30, 1996. Plaintiffs claim that § 1701.01(CC)(2) is preempted by the Williams Act, 15 U.S.C. § 78m(d)–(e) and § 78n(d)–(f).

## PREEMPTION UNDER THE SUPREMACY CLAUSE

■ A state law is preempted by a federal statute under the Supremacy Clause of the Federal Constitution only if (1) Congress clearly expresses an intention to do so, (2) it is impossible to comply with both the federal and the state laws, or (3) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 78–79, 107 S.Ct. 1637, 1644, 95 L.Ed.2d 67 (1987) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

## THE OHIO CONTROL SHARE ACQUISITION ACT

Ohio Rev.Code § 1701.831, the Ohio Control Share Acquisition Act ("OCSAA"), is part of Ohio's General Corporation Law and regulates "control share acquisitions" as defined in § 1701.01(Z)(1). Plaintiffs' tender offer proposes a control share acquisition within the meaning of the OCSAA. The Act provides that any control share acquisition "shall be made only with the prior authorization of the shareholders of such corporation in accordance with this section." § 1701.831(A). Any person who proposes to make a control share acquisition is required to deliver an "acquiring person statement" to the corporation containing certain specified information. § 1701.831(B). Within ten days after the receipt of the acquiring person statement, the directors of the corporation must call a special meeting of shareholders (the "831 meeting") to vote on the proposed control share acquisition. The meeting must be held within fifty days after receipt of the statement unless a different date is agreed to by the corporation and acquiring person. § 1701.831(C).

The proposed acquisition may be consummated only on the occurrence of two events: (1) the shareholders at the 831 meeting at which a quorum is present authorize the acquisition by (a) an affirmative vote of a majority of the voting power represented at such meeting in person or by proxy, and (b) an affirmative vote of a majority of that voting power excluding the voting power of interested shares, § 1701.831(E)(1); and (2) the acquisition is consummated, according to its terms, not later than 360 days following shareholder authorization, § 1701.831(E)(2). The presence of a quorum requires the satisfaction of two conditions: (a) at least a majority of the voting power of the corporation is represented at the 831 meeting, and (b) a majority of the voting power excluding the voting power of interested shares is represented at the 831 meeting (respectively, the "first quorum," the "second quorum"). Ohio Rev.Code § 1701.831(E)(1).

In 1990, the Ohio General Assembly amended § 1701.01(CC) to create a new class of interested shares. It did so by enacting § 1701.01(CC)(2) which defines interested shares as any shares acquired during the period beginning with the date of the first public disclosure of the proposed acquisition and ending on the date of the 831 meeting if the aggregate consideration paid for such shares exceeds $250,000 or the number of shares acquired exceeds one-half of one percent of the outstanding shares of the corporation entitled to vote in the election of directors. This provision was apparently intended to minimize the ability of speculators or arbitrageurs to influence the voting results of the 831 meeting. It is this provision and only this provision of the OCSAA which plaintiffs challenge in the instant motion. District court decisions in both the Northern District and the Southern District of Ohio hold that other provisions of the Ohio Act would likely withstand challenge under the Supremacy Clause and the Commerce Clause. *See Veere Inc. v. Firestone Tire &*

*Rubber Co.,* 685 F.Supp. 1027 (N.D.Ohio 1988), and *CEIC Holding Co. v. Cincinnati Equitable Ins. Co.,* No. C–1–84–1587, slip op., 1984 WL 2922 (S.D.Ohio, November 8, 1984).

## SALES AFTER RECORD DATE— VOTING RIGHTS

The role of the record date in shareholder voting is specified in Ohio Rev.Code § 1701.45(A) which reads:

For any lawful purpose, including, without limitation, the determination of the shareholders who are entitled to: (1) receive notice of or to vote at a meeting of shareholders; (2) receive payment of any dividend or distribution; (3) receive or exercise rights of purchase of or subscription for, or exchange or conversion of, shares or other securities, subject to contract rights with respect thereto; or (4) participate in the execution of written consents, waivers, or releases; the directors may fix a record date which shall not be a date earlier than the date on which the record date is fixed and, in the cases provided for in clauses (1), (2) and (3) above, shall not be more than sixty days, unless the articles or the regulations specify a shorter or a longer period for such purpose, preceding the date of the meeting of the shareholders, or the date fixed for the payment of any dividend or distribution, or the date fixed for the receipt or the exercise of rights, as the case may be.

· The statute is silent on what happens to voting rights if shares are sold after the record date. Uncontroverted evidence was submitted in the instant case suggesting that the standard practice is that unless otherwise contracted for, stock sales after the record date lack voting rights for the corresponding shareholders meeting. In other words, after the record date, voting rights (for the corre-

sponding shareholders meeting) become separated from the other incidents of stock ownership. It is possible therefore to sell one's stock after the record date and still retain voting rights. Ohio case law in support of this understanding of the record date consists only of *Wick v. Youngstown Sheet & Tube Co.,* 46 Ohio App. 253, 188 N.E. 514 (1932), which involved an earlier version of § 1701.45. *Wick* held that the inspectors of a corporate election properly permitted votes by holders of proxies given by shareholders on the record date even though their shares were sold after the record date but before the shareholders' meeting.[1]

## THE WILLIAMS ACT

█ The Williams Act was passed in 1968 as an amendment to the Securities Exchange Act of 1934, in response to an increase in the frequency of hostile tender offers. *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 79, 107 S.Ct. 1637, 1644, 95 L.Ed.2d 67 (1987). The Act requires an entity which has acquired more than five percent of a class of securities to disclose certain information, including its plans for the target company, within ten days of the acquisition. 15 U.S.C. § 78m(d)(1). In addition, the Williams Act establishes a set of procedural rules intended to regulate the process of tender offers. Stockholders who tender their shares may withdraw them during the first seven days of a tender offer and, if the offeror has not yet purchased their shares, at any time after sixty days from the commencement of the offer. 15 U.S.C. § 78n(d)(5). The offer must remain open for at least 20 business days. 17 CFR § 240.14e–1(a). If more shares are tendered than the offeror sought to purchase, purchases must be made on a *pro rata* basis from each tendering shareholder. 15 U.S.C. § 78n(d)(6). Finally, all shares tendered must be purchased for the same price; if an offering price is increased,

---

1. The question of the separation of voting rights from other incidents of ownership has recently been considered by Chancellor Allen in *Commonwealth Associates v. Providence Health Care,* 641 A.2d 155 (Del.Ch., 1993). On the facts of that case, it was held that the contract for a post-record date sale of stock implicitly included the transfer of voting rights (for the corresponding shareholders meeting). In addition, in dictum,

the Chancellor revealed his inclination to "doubt whether, in a post-record date sale of corporate stock, a negotiated provision in which a beneficial owner/seller specifically retained the 'dangling' right to vote as of the record date, would be a legal, valid and enforceable provision, unless the seller maintained an interest sufficient to support the granting of an irrevocable proxy with respect to the shares." *Id.* at 157.

those who have already tendered receive the benefit of the increase. 15 U.S.C. § 78n(d)(7).

In *Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), the court found that in enacting the Williams Act, "Congress was indeed committed to a policy of neutrality in contests for control, but its policy of evenhandedness does not go ... to the purpose of the legislation.... Neutrality is, rather, but one characteristic of legislation directed toward a different purpose—the protection of investors." *Id.* at 29, 97 S.Ct. at 943. "The legislative history ... shows that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Id.* at 35, 97 S.Ct. at 946.

In *Edgar v. MITE Corp.*, 457 U.S. 624, 639, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982), a plurality of the justices found that an Illinois takeover statute violated the Supremacy Clause of the Federal Constitution because "[t]he potential for delay provided by [the statute] upset the balance struck by Congress by favoring management at the expense of stockholders." The plurality found that "[i]n enacting the Williams Act, Congress itself 'recognized that delay can seriously impede a tender offer'," *Id.* at 637, 102 S.Ct. at 2638 (quoting *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1277 (5th Cir.1978)), and that "Congress anticipated that investors and the takeover offeror would be free to go forward without unreasonable delay." *Id.* at 639, 102 S.Ct. at 2639. As Justice White noted in *MITE*, Congress reemphasized the consequences of delay when it enacted the Hart–Scott–Rodino Anti–Trust Improvements Act of 1976, 15 U.S.C. § 12 *et seq.*, and to demonstrate this point, he quoted from the legislative history of that Act:

> This ten-day waiting period thus underscores the basic purpose of the Williams Act—to maintain a neutral policy towards cash tender offers, by avoiding lengthy delays that might discourage their chances for success.

*Id.* at 638, 102 S.Ct. at 2638.

In *CTS,* 481 U.S. at 85, 107 S.Ct. at 1647, five years after the decision in *MITE,* Justice Powell, writing for the majority of the court, drew attention to the fact that:

> Nothing in *MITE* suggested that *any* delay imposed by state regulation, however short, would create a conflict with the Williams Act. The plurality argued only that the offeror should 'be free to go forward without *unreasonable* delay'. 457 U.S. at 639, 102 S.Ct. at 2639 (emphasis added).

In *CTS* the Court, without disavowing the analysis given by the *MITE* plurality, found that the Indiana statute in question "passes muster even under the broad interpretation of the Williams Act articulated by Justice White in *MITE.*" *CTS*, 481 U.S. at 81, 107 S.Ct. at 1645. The court was careful to note that while the Indiana statute did impose what was in effect an additional fifty-day waiting period, that delay was still within the sixty-day period established by Congress for the reinstitution of withdrawal rights under the Williams Act. *Id.* at 85, 107 S.Ct. at 1647. The *CTS* majority also held that while the Williams Act governs the process of tender offers, it leaves to the states the power to regulate substantive matters of corporate governance. *CTS*, 481 U.S. at 85–86, 107 S.Ct. at 1647–48.

## BACKGROUND

This is the third time this Court has been called upon to consider the constitutionality of § 1701.01(CC)(2). In *Luxottica Group S.p.A. v. U.S. Shoe Corp.*, 919 F.Supp. 1085 (S.D.Ohio 1995), this Court held that § 1701.01(CC)(2) was preempted by federal law because it "imposes an unreasonable delay beyond the sixty-day period established for the reinstitution of withdrawal rights under the Williams Act." *Id.* at 1088. The Court reached this conclusion because it was "undisputed that it would take at least four weeks after [the date of the 831 meeting] to solicit the shareholders who appeared at the 831 meeting in person or by proxy to obtain the information necessary to determine their status under § 1701.01(CC)(2). Even then, ... in many instances the information would be incapable of verification by the inspectors of elections." *Id.* at 1089.

In *Danaher Corporation v. Acme–Cleveland Corporation,* S.D. Ohio Case No. C2–96–247, this Court was again confronted with the issue of the constitutionality of § 1701.01(CC)(2) in the context of a hostile tender offer. In *Danaher,* unlike *Luxottica,* the target corporation, defendant Acme–Cleveland, contended that it was possible to promptly and reliably determine the status of shareholders who appeared at the 831 meeting and that the provisions of §§ 1701.01(CC)(2) and 1701.831(E)(1) could be implemented without frustrating the purposes of the Williams Act. Defendants claimed to be able to accomplish this by adopting a set of procedures for the ·831 meeting which included self-certifying proxies in which shareholders would certify their status under § 1701.01(CC)(2), and special presumptions which the inspectors of elections would apply in determining whether the quorums existed .for the votes required under § 1701.831(E)(1). The plaintiffs in *Danaher* contested the validity of these procedures, arguing that they were unworkable in practice, that they would impermissibly disenfranchise shareholders, and that notwithstanding defendants' proposed election procedures, the implementation of the contested provisions of the OCSAA would frustrate the purposes of the Williams Act. Before the Court could make a final ruling on the constitutionality of § 1701.01(CC)(2) in light of the new evidence and arguments advanced in *Danaher,* the parties entered into a merger agreement and the case was voluntarily dismissed.

In the instant case, as in *Danaher,* the target corporation CIC proposes self-certifying proxies to be completed by the shareholders and a list of presumptions to guide the inspectors of election in order to implement the provisions of §§ 1701.01(CC)(2) and 1701.831(E)(1). Like the defendant in *Danaher,* CIC contends that these procedures will overcome the problems identified in *Luxottica.* At the hearing on plaintiffs' motion for a preliminary injunction, CIC presented evidence in support of its proposed election procedures which was sufficiently convincing to persuade the Court to deny the relief requested. Noting that "the Court's power to declare a state statute unconstitutional is

one which should be resorted to sparingly, and the party who asserts that a state statute is unconstitutional under the Supremacy Clause· bears a heavy burden," the Court denied plaintiff's motion. Transcript of July 30, 1996 hearing, p. 491. However, as in *Danaher,* the parties ceased litigating before the Court rendered a final judgment on plaintiff's claims. On August 5, 1996, United Dominion withdrew its tender offer and shortly thereafter, counsel for the corporate litigants announced their desire to terminate this litigation. Nevertheless, at a status conference held on August 8, 1996, the CIC and state defendants urged the Court to issue a decision on the constitutionality of § 1701.01(CC)(2). In view of .the time and effort devoted to these issues in both *Danaher* and the instant case and in view of their importance to the bench, bar and business community of Ohio, the Court will take the occasion to express its current convictions on the interpretation and constitutionality of § 1701.01(CC)(2) and the election procedures proposed by defendant CIC.

## THE "ONCE TAINTED, ALWAYS TAINTED" PROBLEM

In *Luxottica,* the Court identified two problems with the text of § 1701.01(CC)(2). The first was the provision defining interestedness in terms of shares as opposed to persons and the second was the provision ending the period for determining the interested status of shares on the date of the· 831 meeting. The definition of interestedness in terms of shares instead of persons was considered to be a problem because under a literal interpretation of the statute, once a share becomes interested it remains interested regardless of who its current owner might be. So, for example,· if $x$ were ·to purchase $300,000 worth of shares in the defining period, those shares would continue to be interested even if $x$ were to sell all his shares to $y$ and $z$, each receiving one-half of the shares. In other words, the shares in.the hands of $y$ and $z$ would be interested even though neither owned more than $250,000 worth. Counsel in these cases have referred to this as the "once tainted, always tainted" interpretation of § 1701.01(CC)(2). ·The Court in

*Luxottica* did not pursue whether other permissible interpretations of the statute might resolve the once tainted, always tainted problem because the Court concluded that there was an "even more basic problem" with § 1701.01(CC)(2), namely, the undisputed fact (in *Luxottica* ) that it would take at least four weeks after the date of the 831 meeting to determine the status of the shareholders who appeared there. 919 F.Supp. at 1089.

In *Danaher*, the Court reconsidered the once tainted, always tainted interpretation of § 1701.01(CC)(2):

> ... I think that construction of the statute leads to an absurd result and one that was certainly not intended by the General Assembly and one that's not necessitated by the language that it used in defining interested shares in § 1701.01(CC)(2).
>
> I continue to interpret the statute as extending the period of disqualification through the date of the 831 meeting, and I believe that a fair reading of the statute leads to the conclusion that any shares, and again it's my belief that the General Assembly was focusing on shares, not individuals, but they're measuring the disqualification of the shares in terms of attributes of an individual who holds them at the time of the 831 meeting; and if that individual acquired more than $250,000 worth of shares from the time of the public announcement until the time of the 831 meeting, those shares are disqualified.

Transcript of April 11, 1996 hearing, pp. 523–24.

The Court continues to believe that this is the correct interpretation of the statute. This interpretation requires an evaluation of the status of the shares as of the date of the 831 meeting, first for the purpose of voting, and second for determining the existence of a quorum. If on that date shares sought to be voted at the meeting are held by a person who acquired more than $250,000 worth of shares, or more than one-half of one percent of the outstanding shares between the date of the public announcement of the proposed control share acquisition and the date of the 831 meeting, then those shares are disqualified from the second vote. Likewise any shares held by such a person on the date of

the 831 meeting are excluded in determining the second quorum. Shares which were disinterested on the record date for the 831 meeting may be rendered interested if the holder acquires additional shares after the record date. So, for example, if $x$ buys less than $250,000 before the record date, votes those shares, and then purchases additional shares putting his total ownership above the $250,000 plateau, it follows according to § 1701.01(CC)(2) that $x$'s shares are interested. This illustrates a central feature of the definition, viz., the defining acquisition period is bounded by the date of the 831 meeting and not that of the record date. But the fact that the defining period is concluded by the 831 meeting does not mean that shareholders must continue holding their shares until the 831 meeting in order to own interested shares. Shares will be interested in the hands of their purchaser so long as either of the defining maximums are exceeded anytime in the period bounded by the acquisition announcement and the 831 meeting. An example much discussed by the parties in the instant case deals with the arbitrageur who buys $1,000,000 worth of shares, sells $800,000 worth, and then votes the remaining $200,000 worth of shares. The arbitrageur's shares remain interested because his initial purchase exceeded the $250,000 maximum. Therefore, his vote is not counted when considering the second majority.

In summary, in order to determine whether shares are interested or not in the hands of some owner, one must look back from the time of the 831 meeting and determine whether that owner has purchased, in the defining period, shares in excess of either of the defining maximums. If the owner sells his shares then § 1701.01(CC)(2) must be separately applied to the new owner or owners. So, returning to an earlier example, if $x$ were to purchase $300,000 worth of shares in the defining period, these shares would be interested when in his hands. But once $x$ sells $150,000 worth of shares to each of $y$ and $z$, these shares become disinterested when in their hands. Therefore, if it is $x$ who votes the shares, the vote will be interested. But if it is $y$ and $z$ who vote them, the votes will be disinterested.

Because § 1701.831(E) requires a second majority as well as a second quorum, two determinations of the interested nature of shares must be made. Insofar as those who vote continue to hold their shares until the 831 meeting, these two determinations will collapse into one. But insofar as shares are voted and sold before the 831 meeting, these determinations will be different. So, for example, if $x$ were to purchase only $200,000 worth of shares in the defining period, vote those shares, and then sell them to $y$, $x$'s vote would be disinterested because his shares were disinterested in his hands. But if $y$ were to have purchased an additional $100,000 worth of stock in the defining period, and if $y$ were to hold on to his total of $300,000 worth of stock until the 831 meeting, then $y$'s shares would be interested for the purposes of the second quorum determination. In other words, it is possible that shares will be counted as disinterested for the purpose of the second vote, but interested for the purpose of the second quorum determination. The reverse could also be true as well. While these are somewhat anomalous results, there is, so far as the Court can determine, no mathematical or logical incoherence involved. Section 1701.01(CC)(2) is uniformly applied in the determination of the interested status of shares. It is just that in the hypothetical case just discussed, the § 1701.01(CC)(2) definition needs to be applied first to $x$ in order to determine the nature of his vote, and then to $y$ in order to determine the presence of a second quorum. This is because $x$ owned the shares when they were voted, and $y$ owned the shares at the time of the 831 meeting.

The bottom line of this analysis is that in order to know whether shares purchased in the defining period are interested or not, all that needs to be determined is whether or not a shareholder's total ownership of such shares at any time in the defining period exceeded $250,000 in purchase costs or one-half of one per cent of the outstanding shares of the corporation entitled to vote in the election of directors. This means that what shareholders are being asked to certify on information seeking proxies can be specified in a relatively straightforward way.

In interpreting § 1701.01(CC)(2) the Court has been guided by the following principles. First, federal courts interpreting state law must look to "the policy of the [state] respecting judicial revision of [state] statutes." *Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir.1991); *K–S Pharmacies v. American Home Products,* 962 F.2d 728, 730 (7th Cir.1992). Second, when disambiguating a statute a court may consider "the object sought to be attained" as well as the "consequences of a particular construction." Ohio Rev.Code § 1.49(A) and (E). *See State v. Sidell,* 30 Ohio St.2d 45, 46 n. 1, 282 N.E.2d 367, 368 n. 1 (1972); *Crowl v. DeLuca,* 29 Ohio St.2d 53, 58, 278 N.E.2d 352, 356 (1972). Finally, where constitutional questions are raised, courts should liberally construe statutes in a manner that saves them from constitutional infirmity. *State v. Sinito,* 43 Ohio St.2d 98, 101, 330 N.E.2d 896, 898 (1975).

## THE ADVERBIAL PHRASE PROBLEM

Section 1701.01(CC)(2) reads as follows:

"Interested shares" also means any shares of an issuing public corporation acquired, directly or indirectly, by any person from the holder or holders thereof for a valuable consideration during the period beginning with the date of the first public disclosure of a proposed control share acquisition of the issuing public corporation or any proposed merger, consolidation, or other transaction which would result in a change in control of the corporation or all or substantially all of its assets, and ending on the date of any special meeting of the corporation's shareholders held thereafter pursuant to section 1701.831 of the Revised Code, for the purpose of voting on a control share acquisition proposed by any acquiring person if either of the following apply:

(a) The aggregate consideration paid or given by the person who acquired the shares, and any other persons acting in concert with him, for all such shares exceeds two hundred fifty thousand dollars;

(b) The number of shares acquired by the person who acquired the shares, and

any other persons acting in concert with him, exceeds one-half of one per cent of the outstanding shares of the corporation entitled to vote in the election of directors.

In the instant case, as in *Danaher,* the state of Ohio argues for an interpretation of § 1701.01(CC)(2) which turns on the role of the adverbial phrase that occurs at the end this paragraph, viz., "for the purpose of voting on a control share acquisition proposed by any acquiring person" (the "adverbial phrase"). The state argues that the adverbial phrase modifies "any shares," which occurs at the beginning of the paragraph, instead of "any special meeting," which occurs toward the end of the paragraph. Under this reading, shares which otherwise meet the definition of interested shares would become interested only if they were purchased for the purpose of voting at the 831 meeting. The interested status of shares would therefore depend upon a shareholder's state of mind when the shares were purchased. But to require inspectors of corporate elections to inquire into the purposes and intentions of beneficial owners violates traditional and sound public policy concerning corporate elections. As explained by Chancellor Allen:

A legal test that made inquiry into the subjective wishes of ultimate owners relevant would, of course, threaten to convert every close proxy fight into protracted and costly litigation. The law has avoided that risk while attempting to preserve a credible claim to corporate democracy by announcing the rule that only record owners are entitled to vote and if any investor chooses to hold his stock in some fashion other than his own name, he thereby assumes the risk that involving intermediaries will entail.... Moreover, even as to record owners, the administrative need for expedition and certainty are such that judges of election (and reviewing courts absent fraud or breach of duty) are not to inquire into their intention except as expressed on the face of the proxy, consent or other "ballot."

*Blasius Industries v. Atlas Corp.,* 564 A.2d 651, 668 (Del.Ch.1988) (citations omitted). In *Williams v. Sterling Oil of Oklahoma, Inc.,*

273 A.2d 264, 265–66 (Del.Supr.1971), the court noted:

The policy favoring correction of mistake must be limited to corrections that can be made from the face of the proxy itself or from the regular books and records of the corporation. The acceptance and consideration of extrinsic evidence for the purpose, especially when questioned and controverted as here, improperly take the inspectors over the line from the realm of the ministerial to that of the quasi-judicial.

The Court finds that the adverbial phrase modifies "any special meeting" and not "any shares." It is simply not reasonable to believe that the Ohio General Assembly could have intended inspectors of contested proxy votes to rule on the many interpretational problems that would result if the adverbial phrase is taken to modify "any shares."

## THE PROBLEM OF DETERMINING THE INTERESTED STATUS OF SHARES FOR THE PURPOSES OF THE 831 MEETING

The Court will now turn to the second problem with § 1701.01(CC)(2) which was identified in *Luxottica,* namely, the problem of obtaining the information necessary to determine the interested status of shares for the purposes of the 831 meeting. As noted above, the CIC defendants propose to solve this problem by using self-certifying proxies to be completed by the shareholders and a list of presumptions to guide the inspectors of elections in making the determinations necessary to calculate the quorums and majority votes required by § 1701.831.

## PROXY SOLICITATIONS

There was a time when buyers of corporate shares received stock certificates and had their identities recorded, thereby becoming record holders of the stock. Sellers of stock transferred the certificates to their new owners and the corporate record books were modified accordingly. But today, shareholders, with rare exception, no longer receive or hold stock certificates. Titles to these certificates are held instead in nominee or "street name" accounts. Nominee accounts involve the designation of a nominee, often a part-

nership, to hold legal title to the shares. Under a nominee arrangement, the beneficial owner retains ownership of and control over the shares but does not appear as the record owner. Street name accounts are just a special case of nominee account. Shares are held by brokers or banks on behalf of customers, with legal title in the name of the broker or bank, or its nominee. It is possible, therefore, for the beneficial owner to become separated from the owner of record by several layers of intermediate forms of ownership. The widespread practice of using embedded nominee and street accounts developed primarily because of the simplifications that such a system provides especially when brokers and banks share the same nominee account or depository. Participants can buy and sell shares without the burdens of transferring certificates and reregistering shares in the name of the new buyer after each transaction. The principal depository is The Depository Trust Company ("DTC") which holds through its nominee Cede and Company.

While the current system of nominee accounts affords significant simplification and corresponding economic benefit, there is a negative side to the ledger. Voting, or the granting of consent to stockholder action, is the legal right of record holders of stock only. Ohio Rev.Code §§ 1701.01(F) and 1701.44. Under Ohio Rev.Code § 1701.37(A), corporations must maintain listings of record shareholders. Because it is only record holders who have the right to vote, beneficial owners exercise the franchise only by proxy. Federal securities law requires that nominees forward proxy materials to each of their customers who are beneficial owners of the issuer's securities. The depository companies (the actual record holders) give blanket proxies to their customers, the institutional record holders, who will then act themselves or through The Independent Election Company of America ("IECA"). IECA distributes voting materials for brokers and banks to their customers and receives back proxy or consent cards from beneficial owners. IECA then tallies results for each broker or bank and reports aggregate results (on separate proxy cards for each broker or bank) to the corporation or the inspectors of election. Because it is only aggregate results that are typically reported, problems often result due to the absence of specific information concerning beneficial owners. So, for example, in the case of a consent solicitation to expand the board of directors, shareholders may receive a dissident shareholders' proxy seeking consent to enlarge the board as well as a management proxy giving shareholders the opportunity to revoke any consent previously given. But because most financial institution cards do not have subaccount numbers or otherwise identify beneficial owners, there is no way to be sure that a later revocation is intended to revoke an earlier consent, or whether it represents an altogether different collection of shares. For an informative discussion of such problems and the current system of nominee accounts, see Blasius, 564 A.2d at 663–67. The "Cede breakdown," the list of brokerage firms sharing in the common nominee account provided by the DTC, is described in RB Associates v. Gillette Co., 13 Del.J.Corp.L. 1220, 1225, 1988 WL 27731 (Del.Ch.1988).

## SELF–CERTIFYING PROXIES AND OHIO LAW

Defendants propose, as did defendants in *Danaher*, to utilize information seeking proxies where beneficial owners are asked to certify the status of their shares as "interested" or "disinterested" by indicating on their proxies whether they purchased more than $250,000 of shares after the announcement of the tender offer.[2] They are also asked to agree to update their certification should they purchase or sell shares after they complete and return their proxy forms. See Defendants' Exhibit 3, PROXY CARD/TRUSTEE INSTRUCTION CARD CERTIFICATION OF ELIGIBILITY and FORM OF PROXY FOR COMMON

---

**2.** Ohio Rev.Code § 1701(CC)(2)(b) has no practical application in the instant case. When United Dominion's tender offer was announced, Commercial Intertech had approximately 15.5 million outstanding shares. Assuming the post-

tender offer market price of about $29 per share, any purchase of one-half of one percent of Commercial Intertech's outstanding shares would require consideration several times more than the $250,000 threshold set forth in § 1701(CC)(2)(a).

SHARES NOT IN ESOPS OR PLANS, attached to this opinion as Appendix A.

While no information-seeking proxies of the precise sort CIC proposes have ever been employed, evidence was presented sufficient to show that information-seeking proxies of a similar though simpler sort have been employed, without judicial challenge, in cases where beneficial owners are granted extra voting power on condition that they have held their shares for longer than some specified time. Defendants gave several instances of information-seeking proxies used in elections where shareholders had to certify whether their shares qualified for supervoting power. There are no cases, however, where courts have been called upon to approve these sorts of information seeking proxies. In *Williams v. Geier*, 671 A.2d 1368 (Del.Ch.1996), the court approved a recapitalization plan which provided that shareholders who held for a specified time received ten votes instead of the usual one vote per share. The court did not, however, consider what the corresponding election procedures and proxy materials should be.

■ As a threshold matter plaintiffs challenge CIC's legal authority to impose the use of information-seeking proxies. Plaintiffs appeal to Ohio Rev.Code § 1701.48(A) which states:

A person who is entitled to attend a shareholders' meeting, to vote thereat, or to execute consents, waivers, or releases, may be represented at such meeting or vote thereat, and execute consents, waivers, and releases, and exercise any of his other rights, by proxy or proxies appointed by a writing signed by such person.

Plaintiffs conclude from this that it is a violation of Ohio law for corporations to require a certification of eligibility or to extract a promise from shareholders to supply updated information if eligibility changes. In support of their interpretation of § 1701.48(A) and its implications, plaintiffs appeal to *Lobato v. Health Concepts IV, Inc.*, 606 A.2d 1343, 1347 (Del.Ch.1991):

Delaware law does not require that a proxy be in any particular form. The paper writing which we call a proxy is nothing more than evidence of a relationship.

It is not the relationship. It simply testifies that A has constituted B his agent to act for him in a vicarious capacity. To qualify as a proxy, the document must appoint someone to vote the shares, and must include some indication of authenticity, such as a signature. (Citations and quotations omitted.)

The Court fails to see how construing proxies as evidence of the appropriate agency relationship places any constraints on what beneficial owners may authorize, or be asked to authorize, their agents (typically brokers or banks) to do. *Lobato* specifies what a proxy must contain as a minimal condition. It does not restrict the content of the proxy to this minimum. Similarly, § 1701.48(A) contains no restrictions on the content of the writing that beneficial owners may employ to empower their agents to act on their behalf.

■ Plaintiffs also object to the way certain presumptions that will govern the 831 meeting were established by CIC. The inspector of voting testified (and related exhibits confirmed) that the presumptions were prepared by CIC and sent to the inspector for his approval. Plaintiffs' complaint, as this Court understands it, is that having the presumptions originate with the corporation violates standard election and voting practice, and is not authorized by Ohio corporation law. Sections 1701.01(CC)(2) and § 1701.831(E)(1) do not indicate how a determination of the interested status of shares is to be accomplished.

The selection of election and voting inspectors is determined by Ohio Rev.Code § 1701.50(A) which states *inter alia* that:

Unless the articles or the regulations otherwise provide:

(1) The directors, in advance of any meeting of shareholders, may appoint inspectors of election to act at such meeting or any adjournment thereof.

The duties of inspectors, however, are not set by the directors but are specified in § 1701.50(C):

The inspectors shall determine the number of shares outstanding, the voting rights

with respect to each, the shares represented at the meeting, the existence of a quorum, and the authenticity, validity, and effect of proxies; receive votes, ballots, consents, waivers, or releases; hear and determine all challenges and questions arising in connection with the vote; count and tabulate all votes, consents, waivers, and releases; determine and announce the result; and do such acts as are proper to conduct the election or vote with fairness to all shareholders.

As this Court reads the statute, it is of no legal consequence that the election presumptions adopted by the inspector were originally proposed by CIC. This is not to say, however, that the inspector was in any way obligated to adopt those presumptions or that he was relieved of his duty to conduct a vote that would be fair and proper.

## SELF–CERTIFYING PROXIES AND SEC RULES

■ Plaintiffs contend that the self-certifying proxy procedures proposed by CIC violate SEC rules because beneficial owners will be required to disclose information they are entitled to keep confidential. Congress broadly authorized the SEC to promulgate regulations concerning solicitation of proxies, and the SEC's regulations are recognized as "[l]egislative, or substantive, regulations" which "have the force and effect of law." *Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977). SEC Rules 14b–1(b)(3) and 14b–2(b)(4) (collectively, the "NOBO Amendments"), codified in 17 C.F.R. §§ 240.14b–1(b)(3) and 240.14b–2(b)(4), deal with the creation and use of NOBO (non-objecting beneficial owners) lists. A NOBO list is a list of beneficial owners of a corporation's stock who do not object to the disclosure of their name and address by the registered owner of the stock, typically a stock broker or a bank to the corporation itself. The SEC has indicated that the purpose of the NOBO Amendments is to:

[G]overn the process by which registrants communicate with the beneficial owners of securities registered in the name of a broker, dealer or other nominee. The amend-

ments are intended to allow for the most advantageous implementation of the system of direct communication provided under those rules.

SEC Release No. 34–22533, 50 Fed.Reg. 304 (1985).

The NOBO Amendments require brokers and dealers holding record ownership of stock for beneficial owners to "provide the registrant, upon the registrant's request, with the names, addresses, and securities positions, compiled as of a date specified in the registrant's request . . . , of its customers who are beneficial owners of the registrant's securities and who have not objected to disclosure of such information," or, in the case of banks holding record ownership, the same information with respect to "beneficial owners . . . who have consented affirmatively to disclose such information." 17 C.F.R. §§ 240.14b–1(b)(3) and 240.14b–2(b)(4). Plaintiffs emphasize that the NOBO Amendments expressly recognize the beneficial owner's right to object to disclosure of such information as well as the record holder's obligation to abide by such wishes.

But it is a long way from these restrictions on the use and creation of NOBO lists to plaintiffs' conclusion that the NOBO Amendments prohibit the sort of self-certifying proxies CIC proposes. What the NOBO Amendments do is to create a procedure whereby public corporations may communicate directly with beneficial owners who wish such communication. The proxy system, by contrast, is indirect both from corporation to beneficial owner, and from beneficial owner back to corporation. In the instant case, United Dominion and CIC will send their respective proxies to agents, brokers and banks. Those entities in turn will pass the proxies to the beneficial owners. Thereafter, the beneficial owners send their proxies back to the agents, brokers, and banks who in turn report in aggregate form the votes of their clients, without any identification. In actuality, these functions are typically taken care of by IECA or similar services. No information concerning the names, addresses, and securities positions of specific beneficial owners makes its way back to either the corporation or voting inspector. Taking the

above considerations into account, the Court finds that the self-certifying proxies proposed by CIC do not run afoul of SEC Rules.

## VERIFICATION OF THE CONSISTENCY OF VOTING RESULTS

If it were simply a matter of beneficial owners being able to certify the status of their shares as interested or not, the use of information-seeking proxies proposed by defendants would be sufficient to satisfy the requirements of §§ 1701.01(CC)(2) and 1701.831(E)(1). But inspectors of corporate elections are typically called upon to independently verify the consistency of certain aspects of an election. So, for example, it is not uncommon for brokers and other record holders to "overvote," that is, to report more shares voted by beneficial owners than the broker or record owner actually owns or controls through its contractual arrangements with DTC or similar depositories. Inspectors can determine whether overvoting has occurred by checking the aggregate proxy reports sent by brokers or banks against the books and records of the corporation. For an example of overvoting, see *Blasius*, 564 A.2d at 666. But in the case of the self-certifying proxy proposed by CIC, no analogous consistency checks are possible because it cannot be determined simply by checking against the corporate records and books whether a broker, for example, has voted more disinterested shares than he in fact holds for beneficial owners. Indeed, the evidence presented in the instant case demonstrated that traditional procedures of checking against corporate books and records would be at best of only marginal value in authenticating the sort of self-certifying proxies that CIC proposes to employ.

CIC responds that the novel requirements imposed by §§ 1701.01(CC)(2) and 1701.831 require novel solutions. In particular, CIC proposes to make use of a private service, Morrow & Co., specializing in what is known as "nominee identification". Such services are relatively new, having been developed within the last twenty years, and they identify with good, though not perfect reliability or completeness, major beneficial owners. In essence, four sources of information are utilized. First, there is the Cede printout. This gives a complete listing of the company shares held by the DTC. Second, there is the NOBO list, which contains the names of all non-objecting beneficial owners. Third, there are bank listings which contain account numbers and amounts, but not owner identification, of all shares held or controlled by the bank providing the listing. Banks are not required by federal or state law, or by stock exchange regulations, to provide such information to nominee services. But the relationship between banks and nominee identification services is sufficiently symbiotic so as to incline banks to cooperate. Fourth, and finally, nominee identification services subscribe to AUTEX, a unit of Thomson Financial Services, which is an electronic marketplace where buyers and sellers post advertisements, and where announcements of sales are made. Analyzing these sources over time, and combining with other personal and informal sources of information, enables nominee services to develop reliable estimations of the major beneficial owners of a corporation. The relevance of all this to the instant case is that the informational and analytical techniques employed by nominee identification services can also be used to reliably estimate the interested status of beneficial owners. This estimation can be used as a consistency check on the validity of the self-certifying proxies that CIC proposes to employ. CIC has made arrangements for Morrow & Co. to turn over to the voting inspectors its data and analysis concerning the interested nature of voting shares. The inspectors can then make use of this information as they deem fit. Such information could also be made available to challengers, or challengers could seek independent nominee identification services for themselves.

Plaintiffs make two objections. The first is that the supplemental information provided by nominee identification services is not sufficiently reliable for the purpose of confirming the interested status of shares. The emergence, however, of nominee identification services that have survived the rigors of the marketplace is some evidence of their reliability. In addition, CIC's expert gave credible explanations of how the information

provided by Morrow & Co. could be usefully employed by inspectors and by those who would challenge election results. Plaintiffs did not present evidence sufficient to convince the Court that the information to be supplied by the nominee identification service was so unreliable that it could not be used for the purpose of determining, with acceptable accuracy, votes at the 831 meeting.

Plaintiffs' second objection is that the use of information supplied by nominee services goes far beyond traditional election procedures and is therefore somehow unfair or illegal. The relevant Ohio statute, § 1701.50, contains no restrictions on the kinds of information inspectors may take notice of. The only restriction imposed by the statute is that "inspectors shall ... do such acts as are proper to conduct the election or vote with fairness to all shareholders." Ohio Rev.Code § 1701.50(C). Plaintiffs have supplied no Ohio case law suggesting that the statute should not be given its plain meaning. While there may be some uncertainty as to the exact boundaries of what inspectors may consider, this Court believes that defendants' proposed use of nominee services is within the constraints imposed by § 1701.50.

A basic problem with § 1701.01(CC)(2) identified in *Luxottica* is that it requires—or so the parties in that case believed—a second shareholder solicitation in order to take account of changes in the interested status of shares due to sales and purchases made after the record date but before the 831 meeting. But in the instant case, CIC makes a credible claim that a second solicitation is not necessary because changes in the interested status of shares traded after the record date can be fairly gauged by means of a combination of shareholder updating, as requested on CIC's initial proxy, and the independent verification provided by a nominee service. Plaintiffs have not provided testimony convincing to this Court that CIC's proposal will not succeed.

### PRESUMPTIONS AND THE DETERMINATION OF THE SECOND QUORUM

Plaintiffs argue that the second quorum requirement of § 1701.831(E)(1) cannot be determined without the use of a presumption that will disenfranchise shareholders, and that because of this the voting scheme imposed by §§ 1701.01(CC)(2) and 1701.831(E)(1) frustrates the "sole purpose" of the Williams Act, namely, "the protection of investors who are confronted with a tender offer." *Piper*, 430 U.S. at 35, 97 S.Ct. at 946. Plaintiffs' argument begins with the observation that CIC's self-certifying proxies are not sufficient to determine the required size of the second quorum even if these proxies are assumed correct on their face. A simple hypothetical is sufficient to establish the point. Assume that some company has 100 outstanding shares, that 60 of those shares are voted, in person or by proxy, at an 831 meeting, and that of the 60 voting shares, 40 have been certified as disinterested and the remaining 20 as interested. In order to determine whether the second quorum is present, the inspector would have to know how many of the nonvoting 40 shares were interested and how many disinterested. But this cannot be known on the basis of the certifying, i.e., voting shares. Beneficial owners certify as to the disinterested or interested nature of their shares only when they return their proxy cards. But if proxy cards are not returned, there is no certification one way or the other. Because the number of disinterested shares in the hypothetical can range anywhere from 40 to 80, the minimum number of disinterested shares needed to satisfy the second quorum can range anywhere between 21 and 41. The former value would be the minimum if all nonvoting shares were interested, while the latter, if all nonvoting shares were disinterested. The problem is that it is impossible on the basis of the self-certifying proxies alone to determine where in the range of possible values the required minimum lies. This is because the proxies returned say nothing about the nature of the remaining unreported, unvoted shares.

CIC proposes to surmount this obstacle by means of a presumption. In essence, their solution is simply to assume that all of the interested shares will be present at the 831 meeting. Because interested shareholders will have invested more than $250,000, CIC claims it is reasonable to assume that all the

interested shares will be voted at the 831 meeting. *See* presumptions 8, 9 and 10 of Defendants' Exhibit 1, DRAFT MEMORANDUM, RE: Special Meeting of Shareholders of August 30, 1996—Formulation of Presumptions and Methods of Calculation for the 831 Meeting, attached to this opinion as Appendix B. But expert witnesses from both sides testified that the presumption is unlikely to be true in the instant case. While these experts agreed that it may be true that most of the arbitrageurs will vote their shares, this opinion was highly qualified and dependent, among other things, on the continuing absence of tender offers from other suitors. Furthermore, it was also agreed that if economic interest dictates, arbitrageurs will sell their shares before the 831 meeting, and that in such cases they typically do not turn in their proxies. Defendants' response is that even if not totally correct, the presumption is acceptable because it is analogous to presumptions currently used and endorsed by the courts of Delaware and other states. As an example, defendants point to the general rule that a proxy that appears regular on its face will be afforded a presumption of regularity. *See, e.g., Levin v. Metro–Goldwyn–Mayer, Inc.,* 221 A.2d 499, 504 (Del.Ch.1966); *Atterbury v. Consolidated Coppermines Corp.,* 20 A.2d 743, 747 (Del.Ch.1941).[3] Because this presumption, and others like it, need not always be true, defendants assert that "mathematical certainty" is not required in corporate elections. There are, however, significant differences between the presumption that all interested shares will be voting and the presumptions that hitherto have received court approval. The latter all deal with the evidential force of what appears on the face of proxy cards.[4] This Court has found no case that approved a presumption that operates in lieu of any written basis. And while it is true that Delaware courts have disfavored the use of external evidence to rebut the presumptive force of proxy cards, those courts have never suggested that presumptions by themselves may be used as a complete substitute for proxy cards and the company's books and records. So the Court must determine whether CIC's assumption that all interested shares are present is consistent with the requirement for fairness imposed by § 1701.50(C).

Assuming that all of the interested shares are present at the 831 meeting means assuming that all of the nonvoting shares are disinterested. It is this consequence of the presumption that makes it possible to set the required size of the second quorum. In the hypothetical, adoption of CIC's presumption sets the quorum at 41 (one plus one-half of the sum of the 40 disinterested, voting shares, and the 40 nonvoting shares presumed to be disinterested). Making the presumption CIC proposes is therefore to assume that the quorum requirement will always be the severest possible. To see this more clearly, assume that the 40 unvoted shares, in fact, consist of 35 which are disinterested and 5 which are interested. The actual second quorum requirement, therefore, is 38, which is smaller than that set on the basis of the presumption. In other words, the management of CIC have helped themselves to a presumption that maximizes the difficulties for shareholder approval of the acquisition. This is an important difference between CIC's presumption and those that have received court approval, for the latter have been neutral with respect to the competing parties. CIC's presumption, by

---

**3.** But see *Berlin v. Emerald Partners,* 552 A.2d 482, 491 (Del.Supr.1988) ("However, when the question is whether there was a quorum at the meeting, a court may inquire into the actual facts." (citing *Atterbury,* 20 A.2d at 748)).

**4.** The major Delaware cases include: *Concord Financial Group, Inc. v. Tri–State Motor Transit Co. of Delaware,* 567 A.2d 1 (Del.Ch.1989), holding that where conflicting proxies were dated on the same date but one was postmarked one day later than the other, the inspector of corporate elections should have looked to postmarks and counted shares as voting according to later mailed proxy; *Blasius Industries v. Atlas Corp.,* 564 A.2d 651 (Del.Ch.1988), holding that election inspectors were entitled to rely on written ballots and that any errors in the counting process resulted from the action of record owners or their agents and did not warrant setting aside the outcome of a consent solicitation; *Williams v. Sterling Oil of Oklahoma, Inc.,* 273 A.2d 264 (Del.Supr.1971), holding that inspectors of elections must reject all identical but conflicting proxies when the conflict cannot be resolved from the face of the proxies themselves or from the regular books and records of the corporation.

contrast, assures incumbent management an advantage, not provided by statute, in every case except the unlikely one where all interested shares are in fact voted. This is a general feature of CIC's presumption that is not dependent on the particular numbers used in the hypothetical.

CIC's presumption is objectionable in yet another way. Despite the fact that interested shares are excluded from the determination of the second quorum as well as the second vote, owners of interested shares may be able to defeat an acquisition offer simply by not voting. A variation of the hypothetical is sufficient to show this. Assume once again that there are 100 shares, with 60 voting, and 40 nonvoting, and where of the voting shares, 40 are disinterested and the remaining 20 interested. Assume also that of the voting shares all of the disinterested shares are voted in favor of the acquisition while all of the interested shares are opposed. The interested shareholders may, for example, be holding out for another offer. The first quorum is present as is the first affirmative majority vote. But on CIC's presumption that all of the nonvoting shares are disinterested, it follows, as already shown, that the second quorum is not present, which means that the acquisition fails. Now assume that five of the nonvoting shares are interested and owned by arbitrageur $x$. Had $x$ voted those shares, i.e., returned his proxy and certified the shares as interested, the second quorum would have been present— even granting CIC's presumption—and the acquisition would have been approved. Taking $x$'s shares into account, the second quorum is 38 (one-half of the sum of 40 and 35 rounded up) which is less than 41, the quorum that results given CIC's presumption and $x$'s not voting his shares. Therefore, simply by not voting, $x$ is able to defeat the acquisition vote, because by not voting $x$ prevents the satisfaction of the second quorum requirement even though $x$'s shares are interested.

Plaintiffs, therefore, are right to complain. But in order to prevail, it is not enough that plaintiffs show that the specific presumption that CIC proposes would violate the requirement of fairness imposed by § 1701.50(C)

and, because of this, frustrate the purposes of the Williams Act. It must also be shown that no presumptions or procedures concerning the interested status of nonvoting shares are possible in the instant case that will not subject shareholders to the unreasonable and uncertain risk of disenfranchisement and quorum manipulation.

One way to eliminate the unfairness inherent in CIC's presumption would be to calculate the actual number of interested shares on the basis of the information provided by the nominee identification service. Defendants' witness Morrow testified that while the nominee identification service had been engaged by CIC only to provide information relevant to the confirmation of the interested status of voting shares, the information provided could also be utilized to estimate the fraction of nonvoting shares that were interested. Whether this is in fact a workable proposition remains to be seen. No evidence was presented sufficient to answer this question. But since plaintiffs have not shown that proposals such as this are unworkable, they have not satisfied what is required for the issuance of a preliminary injunction.

## CONCLUSION

In conclusion, the Court finds that plaintiffs have not shown that they are likely to succeed in their preemption claim. Unlike *Luxottica*, the Court in the instant case is unable to find that the procedures necessary to determine the existence of the second quorum and the results of the second vote would require delay in the consummation of a tender offer well beyond the parameters set by the Williams Act. But likelihood of success on the merits is just one factor that courts must take into account in determining whether to grant a preliminary injunction. Courts must also consider and balance (1) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (2) the probability that granting the injunction will cause substantial harm to others; and (3) whether the public interest is advanced by the issuance of the injunction. *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994); *International Longshoremen's Assoc. v. Norfolk S. Corp.,*

927 F.2d 900, 903 (6th Cir.1991). Because these factors are to be balanced, none are "prerequisites that must be met. Accordingly, the degree of likelihood of success required to support a grant of a preliminary injunction may depend on the strength of the other factors considered." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

If the preliminary injunction is not granted, United Dominion runs the risk of not being able to consummate its tender offer. In *Luxottica,* the Court found that "the application of § 1701.01(CC)(2) to plaintiffs' tender offer ... present[s] plaintiffs with the risk of irreparable harm for which they have no adequate remedy at law." *Luxottica*, 919 F.Supp. at 1091. But in the instant case, CIC's innovative proxy procedures significantly reduce the risk that the tender offer will fail because of the application of § 1701.01(CC)(2). If plaintiffs succeed with their tender offer, then it becomes more likely that the incumbent management of CIC will be replaced. And if the Court were to grant the preliminary injunction requested by plaintiffs, then the probability of success of the tender offer will be increased. Whether or not this increase will be significant, however, is unclear. The parties have presented no evidence to the Court bearing on this issue. Similar uncertainties affect determinations of the likelihood of substantial harms to shareholders. On the one hand, if the tender offer fails, shareholders lose the premium offered by United Dominion. But if the offer succeeds, shareholders may lose the chance of an even more lucrative offer from United Dominion itself or some other suitor. The Court must also consider the fact that if the tender offer is accepted, the remaining shareholders may be coerced into accepting inadequate prices in some form of "back-end" deal engineered by United Dominion. While the possibilities for substantial harm are clear enough, the corresponding probabilities are uncertain. Given the uncertainties of the relevant probabilities and harms, it is best therefore to treat the possible harms to plaintiffs and others "as offsetting." *Dynamics Corporation of America v. CTS Corp.*, 794 F.2d 250, 252 (7th Cir.1986), *rev'd on other grounds,* 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). See also *Amanda Acquisition Corp. v. Universal Foods Corporation,* 877 F.2d 496, 499 (7th Cir. 1989).

Ohio's position on the public interest is stated in Ohio Rev.Code § 1701.832(A)(4):

[I]t is in the public interest for Ohio securities laws to provide evenhanded protection of offerors and shareholders from fraudulent and manipulative transactions arising in connection with control acquisitions.

In potential opposition is the public policy set by Congress when it enacted the Williams Act. But because the question of whether these two expressions of the public interest are in conflict is precisely what is at issue in the instant case, it cannot be said that the public policy set by Congress when it enacted the Williams Act tips the balance in favor of granting the preliminary injunction. Because no other relevant considerations of public interest have been brought to the Court's attention, the Court finds that a consideration of the public interest affords advantage to neither party.

Therefore, taking all of the required factors into account, the Court concludes that the likelihood of success will be decisive in the instant case. Because it has been determined that plaintiffs are not likely to succeed on the merits, the Court finds that plaintiffs are not entitled to a preliminary injunction barring the defendants from applying the provisions of § 1701.01(CC)(2) to plaintiffs' tender offer.

It is so ORDERED.

Appendix A - Defendants' Exhibit 3

## PROXY CARD/TRUSTEE INSTRUCTION CARD

## CERTIFICATION OF ELIGIBILITY

It is the Company's position that a shareholder must sign the certification of eligibility on the proxy card or Trustee Instruction Card or the separate certification of eligibility in the form provided to shareholders by the Company in order to be eligible to vote in determining whether the Control Share Acquisition has been approved by the Second Majority (as defined in the Proxy Statement). IT IS ALSO THE COMPANY'S POSITION THAT COMMON SHARES AND PREFERRED SHARES REPRESENTED BY A PROXY CARD OR TRUSTEE INSTRUCTION CARD WITHOUT A COMPLETED CERTIFICATION SHALL BE PRESUMED TO BE INTERESTED SHARES (AS DEFINED IN THE ATTACHED PROXY STATEMENT) THAT ARE INELIGIBLE TO VOTE IN CONNECTION WITH THE SECOND MAJORITY AUTHORIZATION AS DESCRIBED ON PAGE 11 OF THE ATTACHED PROXY STATEMENT. If either of the following circumstances apply to Common Shares and Preferred Shares owned by a shareholder, the shareholder is entitled to sign the certification as to those Common Shares and Preferred Shares:

a. The Common Shares and Preferred Shares were owned by the shareholder before June 27, 1996, and the shareholder is not United Dominion, OAC, an officer of the Company elected or appointed by its Board of Directors, or an employee of the Company who is also a director of the Company; or

b. The Common Shares and Preferred Shares were purchased by the shareholder on or after June 27, 1996, and the aggregate purchase price of all Common Shares and Preferred Shares, together with any Common Shares and Preferred Shares purchased by any person acting in concert with the shareholder, on or after June 27, 1996, and that will be held as of the date of the 831 Special Meeting, is $250,000 or less.

If, however, any of the following circumstances apply to any of the Common Shares and Preferred Shares represented by the proxy card, the shareholder is not entitled to, and must not, sign the certification as to such Common Shares and Preferred Shares:

1. The shareholder is United Dominion, OAC, an officer of the Company elected or appointed by its Board of Directors, or an employee of the Company who is also a Director of the Company; or

2. The sum of

(i) the aggregate consideration paid for the Common Shares and Preferred Shares acquired, directly or indirectly, by the shareholder and any person acting in concert with the shareholder during the period beginning on or after June 27, 1996 and ending on or prior to August 7, 1996; and

(ii) the aggregate consideration paid for the Common Shares and Preferred Shares acquired, directly or indirectly, by the shareholder and any person acting in concert with the shareholder after August 7, 1996 and on or prior to the 831 Special Meeting

is more than $250,000.

In addition, a shareholder is not entitled to sign the certification with respect to Common Shares and Preferred Shares that were sold after August 7, 1996 to a third person (the "Buyer") known to the shareholder to meet the test of Paragraph (1) or (2) above.

IF THE SHAREHOLDER SIGNS THE CERTIFICATION OF ELIGIBILITY BUT LATER LEARNS THAT THE CIRCUMSTANCES IN EITHER (1) OR (2) ABOVE APPLY TO THE COMMON SHARES AND PREFERRED SHARES, OR THE SHAREHOLDER LATER TRANSFERS COMMON SHARES AND PREFERRED SHARES TO ANOTHER PERSON WHO THE SHAREHOLDER LEARNS IS NOT, OR AFTER GIVING EFFECT TO THE TRANSFER WILL NOT BE, ELIGIBLE TO SIGN THE CERTIFICATION, OR THE SHAREHOLDER LATER LEARNS OTHER FACTS THAT CHANGE THE ELIGIBILITY OF THE COMMON SHARES OR THE PREFERRED SHARES TO VOTE IN DETERMINING WHETHER THE CONTROL SHARE ACQUISITION HAS BEEN APPROVED BY THE SECOND MAJORITY, THE SHAREHOLDER SHOULD (AND BY SIGNING THE CERTIFICATION UNDERTAKES TO) SO NOTIFY THE COMPANY BY USE OF THE DUPLICATE PROXY CARD AND THE ADDITIONAL ENVELOPE PROVIDED.

876

[FORM OF PROXY FOR COMMON SHARES NOT IN ESOPS OR PLANS]

[FRONT]

COMMERCIAL INTERTECH CORP.

THIS PROXY FOR THE SPECIAL MEETING OF SHAREHOLDERS
TO BE HELD ON AUGUST 30, 1996 IS SOLICITED BY THE BOARD OF
DIRECTORS

At the Special Meeting of Shareholders of COMMERCIAL INTERTECH CORP. to be held on August 30, 1996, and at any adjournment thereof, [          ], [          ], and [          ], and each of them, with several powers of substitution and resubstitution, are hereby authorized to represent me and vote my shares upon the proposal to authorize as required by Section 1701.831 of the Ohio Revised Code the proposed control share acquisition by Opus Acquisition Corporation, as more fully described in the Company's proxy statement dated July __, 1996 (the "Proxy Statement"):

| Proposed Control Share Acquisition by Opus Acquisition Corporation | FOR | AGAINST | ABSTAIN |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

THE BOARD OF DIRECTORS
RECOMMENDS A VOTE AGAINST THE
PROPOSAL

[REVERSE]

[CERTIFICATION OF ELIGIBILITY TO VOTE]

As of the date upon which the undersigned signs and delivers this Proxy Card
EITHER

☐ All of the Common Shares represented by this Proxy Card are eligible to be voted in determining whether the proposed control share acquisition has been approved by the "Second Majority" (as defined in the Proxy Statement).
Instruction: check the above box if all of the Common Shares represented by this proxy meet the eligibility criteria stated in Exhibit B of the Proxy Statement.

OR

☐ _____ of the Common Shares represented by this Proxy Card are eligible to be voted in determining whether the proposed control share acquisition has been approved by the Second Majority.

Instruction: check the above box if some, but not all, of the Common Shares represented by this proxy meet the eligibility criteria stated in Exhibit B of the Proxy Statement and fill in the blank with the number of Common Shares that are eligible.

THE COMMON SHARES REPRESENTED BY THIS PROXY CARD WILL BE VOTED AS DIRECTED, OR IF NO DIRECTION IS SPECIFIED, WILL BE VOTED AGAINST THE PROPOSAL.

IF NO CERTIFICATION IS MADE, IT WILL BE PRESUMED THAT NONE OF THE COMMON SHARES REPRESENTED BY THIS PROXY CARD IS ELIGIBLE TO BE VOTED IN DETERMINING WHETHER THE PROPOSED CONTROL SHARE ACQUISITION HAS BEEN APPROVED BY THE SECOND MAJORITY.

PARTICIPANTS IN THE ESOPS CAN ONLY VOTE COMMON SHARES AND PREFERRED SHARES HELD IN THE ESOPS ON THEIR BEHALF BY INSTRUCTING THE ESOP TRUSTEE ON THE TRUSTEE INSTRUCTION CARD PROVIDED TO PARTICIPANTS FOR THAT PURPOSE.

SIMILARLY, PARTICIPANTS IN THE PLANS CAN ONLY VOTE SHARES HELD IN THE PLANS ON THEIR BEHALF BY INSTRUCTING THE PLAN TRUSTEE ON THE TRUSTEE INSTRUCTION CARD PROVIDED TO PARTICIPANTS FOR THAT PURPOSE.

By signing below, you (a) instruct that this Proxy Card be voted as marked; (b) certify the eligibility of your Common Shares to be voted as indicated above; and (c) **undertake to notify the Company if, at any time on or after the date you sign this Proxy Card and on or before the date of the Special Meeting of Shareholders (the "831 Special Meeting"), any of the following should occur:**

(1)    you, or any other persons acting in concert with you, acquire additional Common Shares and the aggregate consideration paid or given by you, and any other persons acting in concert with you, for all Common Shares acquired, indirectly or directly, by you, and any persons acting in concert with you, on or after June 27, 1996 exceeds $250,000;

(2)    you transfer Common Shares to another person who, to your knowledge, is not, or after giving effect to the transfer will not be, eligible to sign the certification of eligibility; or

(3)    to your knowledge, the eligibility of any of the Common Shares to which this Certificate of Eligibility relates otherwise changes.

SIGNATURE(S)                                         DATE

_____          _____

_____

Appendix B—Defendants' Exhibit 1

DRAFT

*MEMORANDUM*

August ____, 1996

TO:  Samuel H. Porter, Presiding Inspector of Election

CT Corporation System, Inc., Inspector of Election

FROM:  Commercial Intertech Corp.

RE:  Special Meeting of Shareholders of August 30, 1996—Formulation of Presumptions and Methods of Calculation for the 831 Meeting

1. It is presumed that a corporation's officers and directors have the power as well as the fiduciary obligation to establish

rules to conduct a fair and efficient share-holder meeting and election that are consistent with Ohio law. In that connection, Section 1701.50 of the Ohio General Corporation Law authorizes the directors to appoint the inspectors of election, and Commercial Intertech has appointed Samuel H. Porter, Esq. as the Presiding Inspector of Election and CT Corporation System, Inc. as Inspector of Election (collectively "Inspectors"). The matters set forth in this Memorandum have been developed by Commercial Intertech in consultation with the Inspectors in connection with their appointment as such by Commercial Intertech.

2. At the meeting on August 30, 1996, the Presiding Inspector shall endeavor to determine whether the required quorum is present; absent a definitive determination to that effect, the quorum shall be presumed to be present to allow the business of the meeting to go forward, even though the final calculation to determine whether the required quorum is present may not be completed for a number of days thereafter.

3. Whether a quorum is present for the First Majority and Second Majority votes will be determined in the customary way; namely, by computing whether more than one-half the sum of all outstanding shares on the books and records of the company as of the Record Date eligible to vote are present in person or by valid proxy. Expressed algebraically, if T equals the total number of shares outstanding at the close of business on the record date which are eligible to vote, and P equals the number of such shares present at the meeting, a quorum is present if $P > 1/2\ T$.

4. This same methodology and algebraic formula will apply to determine whether a quorum is present for both the First Majority and Second Majority votes.

5. It will be presumed that, for each share as to which the certification of eligibility on the proxy card, separate information card, or ballot indicates eligibility to vote in the second election, such share will be presumed eligible to be voted in the second election.

6. It will be presumed that, for each share as to which the certification of eligibility on the proxy card, separate information card, or ballot does not indicate eligibility to vote in the second election, or where there is no form of certification of eligibility provided (as where a proxy card or ballot lacks a form of certification and no separate information card is provided), such share will be presumed ineligible to be voted in the second election.

7. Similarly, it will be presumed that shares present in person or by proxy, but not voted at the meeting, are held by people and entities who have determined to abstain or by brokers who are registering shares as present even though the brokers lack the authority to vote the shares at the meeting (broker non-votes). It will also be presumed that shares not present at the meeting are held by people and entities who have determined not to vote, are unable to vote, don't care, are unaware of the election, or otherwise.

8. It is presumed that those who purchased more than $250,000 of Commercial Intertech stock between the first public announcement of Dominion's proposed acquisition and the record date will be sufficiently motivated as to see that their shares are present at the meeting and voted.

9. It is presumed that those who purchased more than $250,000 of Commercial Intertech stock coupled with voting power in a transaction after the record date will also be sufficiently motivated as to see that their shares are present at the meeting and voted.

10. It is presumed that those who, in a combination of the kinds of transactions described in the two paragraphs above, purchased in the aggregate more than $250,000 of Commercial Intertech stock between the first public announcement of Dominion's proposed acquisition and the time of the meeting will be sufficiently motivated as to see that their shares are present at the meeting and voted.

11. It will be presumed that proxy signers have truthfully and completely carried out

their undertaking to supplement eligibility data in accordance therewith.

12. For quorum purposes as to the First Majority vote, the total number of shares eligible to vote at the meeting ($T_1$) will equal the total number of outstanding shares as of the close of business on August 9, 1996 as reported by the Transfer Agent.

13. For quorum purposes as to the First Majority vote, of the shares eligible to be voted ($T_1$), the number present at the meeting ($P_1$) will equal all such shares present in person or by proxy.

14. For purposes of the First Majority vote, a quorum is present if $P_1 > 1/2 \, T_1$.

15. For quorum purposes as to the Second Majority vote, X equals the number of shares present at the meeting as to which the certificate of eligibility on the proxy card/information card/ballot is not marked indicating eligibility. The total number of shares eligible to vote at the meeting ($T_2$) will be calculated by deducting X from $T_1$. $T_1 - X = T_2$.

16. For quorum purposes as to the Second Majority vote, of the shares eligible to be voted ($T_2$), the number present ($P_2$) will be calculated by deducting X from $P_1$. $P_1 - X = P_2$.

17. For purposes of the Second Majority vote, a quorum is present if $P_2 > 1/2 \, T_2$.

18. If the two-part quorum requirement is not met, neither vote shall be conducted, tabulated, or announced, and the proposed acquisition may not go forward unless a majority of the shares present (even though less than a quorum) vote to adjourn the meeting to a date not later than August 31, 1996 and at the session reconvened after adjournment the quorum requirement is met, in which event the votes could then be conducted.

19. If the quorum requirement is met, a vote constituting the First Majority would require that the number of shares voted in favor of Dominion's proposed control share acquisition exceeds 1/2 of $P_1$. Expressed algebraically, if in the First Majority vote, the number of shares voted "for" equals $N_1$, the acquisition is approved by the First Majority if $N_1 > 1/2 \, P_1$.

20. If the quorum requirement is met, a vote constituting the Second Majority would require that the number of shares voted in favor of Dominion's proposed control share acquisition exceeds 1/2 of $P_2$. Expressed algebraically, if in the Second Majority vote, the number of shares voted "for" equals $N_2$, the acquisition is approved by the Second Majority if $N_2 > 1/2 \, P_2$.

21. It is presumed that the company can conduct a fair, honest, and efficient election. There is no such thing as a perfect election.

22. It is presumed that shares of stock owned by a corporation are eligible to be voted in an election conducted by Commercial Intertech, absent a statute or a provision in the corporation's articles of incorporation or regulations to the contrary.

23. It is presumed that the transfer agent has accurately listed the names of record holders as of August 7, 1996.

24. It is presumed that the transfer agent has correctly calculated and listed the number of shares held by each such person.

25. It is presumed that proxies regular on their face are valid.

26. Whenever ambiguity arises in connection with a proxy/card/ballot, presumptions and determinations shall be made in favor of enfranchising stockholders and affirming the eligibility of their shares to be voted, as opposed to disenfranchising stockholders by finding their shares ineligible to be voted. When a matter arises not covered by these rules and presumptions, validity rather than invalidity and eligibility rather than ineligibility shall be the favored presumptions.

27. It is presumed that each signature on a ballot or proxy is genuine.

28. It is presumed that a signature made on behalf of a business entity is made by a person authorized to act for the entity.

29. It is presumed that a signature made in a fiduciary capacity is made by a person with authority to act in that capacity.

30. It will be presumed that signatures that are hand-printed, made by rubber stamp or other mechanical device or by facsimile are valid.

31. It will be presumed that in the case of signatures where initials or abbreviations are used in place of names of record, where names are used in place of initials in a name of record, where first and middle names or initials are added, or deleted from a name of record, where a married name is used in place of a maiden name of record, where titles are added or deleted from the name of record, or where organization indicia such as Co., Corp., Ltd., and P.L.L. are added or deleted from the name of record, the proxy/card/ballot is valid.

32. If dated, it is presumed that a proxy/card/ballot was executed on the date indicated.

33. It is presumed that undated proxies otherwise regular are valid.

34. Where a record owner submits multiple proxies/cards/ballots, the most recent submission before the polls close will be presumed valid, to be determined by the date on the proxy/card/ballot, or in the case of multiple proxies/cards/ballots executed of even date that bear the most recent postmark or other similarly verifiable transmission date and time will be presumed valid.

35. Where a proxy/card/ballot is legibly signed by a record owner, it will be presumed valid even if the proxy/card/ballot indicates no number of shares, no printed or stenciled name or address, or states any such information incorrectly, in which case the number of shares shown on the corporate records shall control.

36. Unless otherwise expressly indicated to the contrary, a proxy/card/ballot will be presumed as intended to vote all the shares of the record owner submitting the proxy/card/ballot.

37. It is presumed that depositaries, brokers, banks, fiduciaries, and others owning shares as nominees for beneficial owners will comply with applicable laws, including SEC rules for obtaining and reporting votes cast by the beneficial owners, by:

a. correctly identifying each beneficial owner as of August 7, 1996;

b. correctly computing the number of shares held by each as of August 7, 1996;

c. taking all reasonable and customary steps to communicate with each beneficial owner;

d. accurately tabulating the information transmitted to them from beneficial owners; and

e. truthfully and accurately reporting that tabulation on an omnibus proxy.

38. Proxies/cards/ballots transmitted by telegram, telex, telecopy, or similar conveyance will be presumed valid, so long as they conform to the content of the relevant proxy/card/ballot.

39. It is presumed that proxies/cards/ballots were not signed by persons who suffer a legal disability of any kind or under fraudulent or coercive circumstances.

40. It is presumed that all transfers of shares through the close of business August 7, 1996 will be known to Commercial Intertech or its Transfer Agent by August 30, 1996.

41. It is presumed that people who appear to vote in person are who they say they are, and are not impostors impersonating record stockholders.

42. Notwithstanding any other provision herein:

(a) All proxies/cards/ballots received from a broker, bank or nominee will be counted, provided that (1) the total number of shares represented by such proxies/cards/ballots does not exceed the sum of (A) the total number of shares registered in the name of such broker, bank or nominee plus (B) the total number of shares held for the account of such broker, bank or nominee by any depositary which has submitted an omnibus proxy authorizing such broker, bank or nominee to vote the shares held for its account, (2) no specific language has been added to any proxy/card/ballot, aside from the printed language on the proxy/card/ballot form, expressly revoking any prior proxy or prox-

ies/cards/ballots solicited by the same party, but any such revocation shall be given effect, and (3) a later dated proxy/card/ballot bearing one account number or other identifying number or symbol will revoke any earlier dated proxy/card/ballot which bears the same account number or other identifying number or symbol and shares.

(b) Except as provided in the following sentence, where the total number of shares represented by proxies submitted by a single broker or nominee exceeds the sum of (A) the total number of shares registered in the name of such broker or bank plus (B) the total number of shares held for the account of such broker or bank by any depositary which has submitted an omnibus proxy authorizing such broker or bank to vote the shares held for its account, the inspectors shall endeavor to procure an explanation for the overvote, as expeditiously as possible, by telephonic statement from such broker or bank, as the inspectors deem appropriate, and after receiving and considering such information the inspectors shall determine the manner in which the proxies/cards/ballots shall be voted. Notwithstanding anything herein stated, in the event of such an overvote, if all of such proxies/cards/ballots submitted by a single broker or nominee are in favor of, or against, authorization of the proposed control share acquisition, such proxies/cards/ballots shall be deemed valid for a number of shares equal to the sum of (A) the total number of shares registered in the name of such broker or bank plus (B) the total number of shares held for the account of such broker or bank by any depositary which has submitted an omnibus proxy authorizing such broker or bank to vote the shares held for its account.

(c) A broker, bank or nominee proxy/card/ballot may be signed in the name of the broker, bank or nominee as registered, without requiring the signature of an individual as a partner or as an officer.

43. Notwithstanding anything herein contained, in the absence of other ambiguity, as determined by the inspectors, a broker, bank or nominee proxy which does not specify a designated number of shares shall be valid for the sum of (A) the total number of shares registered in the name of such broker, bank or nominee and (B) the total number of shares held for the account of such broker, bank or nominee by any depositary which has submitted an omnibus proxy authorizing such broker, bank or nominee to vote the shares held for its account.

44. The truth and accuracy of any certification of eligibility used as the basis for making any calculation hereunder for the meeting may be challenged by evidence deemed competent and reliable by the Presiding Inspector which is timely submitted, in which case the eligibility of any share to be voted will be determined by the Presiding Inspector as provided below. Besides any such extrinsic evidence mentioned in the preceding sentence or elsewhere herein, in light of R.C. Section 1701.01(CC), if the classification of a share as "interested" or as not "interested" is called into question by a timely challenge supported by competent and reliable evidence, the Presiding Inspector shall undertake such inquiry as he deems appropriate to resolve the matter in the light of Sections 1701.01(CC), 1701.50, and 1701.831 of the Ohio General Corporation Law, the "Inspector of Election—Procedures and Regulations" attachment (the "Attachment") to the agreements of Commercial Intertech with the Presiding Inspector of Election and with the Inspector of Election, the books and records of Commercial Intertech, and this Memorandum, unless otherwise provided by Ohio law. All challenges, regardless of nature, are to be determined by the Presiding Inspector of Election in consultation with the Inspector of Election. Any matter not expressly covered by this Memorandum or the Attachment shall be dealt with in accordance with Ohio law.